Seth J. OLIVER and Kathy Oliver, Respondents,

v.

CAMERON MUTUAL INSURANCE COMPANY, Appellant.

No. 62571.

Missouri Court of Appeals, Eastern District, Division Three.

Sept. 21, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 1993.

Application to Transfer Denied Jan. 25, 1994.

Kemper R. Coffelt, Dwight A. Vermette, Coffelt & Coffelt, P.C., Clayton, for appellant.

Mark T. Stoll, Daniel A. Cytron, Wegmann, Gasaway, Stewart, Schneider, Dieffenbach, Tesreau & Stoll, Hillsboro, for respondents.

SMITH, Judge.

Defendant, Cameron Mutual Insurance Company, appeals from a judgment in a court tried case awarding plaintiff Seth Oliver $73,000 as uninsured motorist coverage for injuries sustained by him in an automobile accident, awarding plaintiff Kathy Oliver $75,000 as uninsured motorist coverage for loss of consortium, awarding plaintiffs $14,-950 for vexatious refusal to pay, and $49,-060.96 for attorneys fees. We affirm.

Seth Oliver was severely injured in an automobile accident with Michael Bush. The trial court awarded plaintiff Seth Oliver $300,000 against Bush and awarded Kathy Oliver $100,000 for loss of consortium against Bush. Bush was uninsured. The Olivers' had two policies of insurance with Cameron Mutual. The first was a policy referred to by the parties as the "special policy" which insured a 1989 Hyundai titled in Seth's name and with GMAC as the loss payee. The second, referred to by the parties as the "regular policy" insured a 1983 Mazda owned by the Olivers' by the entireties. Both policies provided for uninsured motorist coverage of $25,000 per person and $50,000 per accident.

On October 19, 1989, Seth drove the Hyundai to a dealership and agreed to trade in both the Hyundai and the Mazda for a new 1989 Mazda truck. After having the Hyundai examined, Seth drove it home and returned to the dealership in the 1983 Mazda to have it inspected. While at the dealership Seth signed a power of attorney authorizing the dealer to sign as his attorney in fact for the purpose of assigning the title on the Hyundai. Seth also signed a retail installment contract for the purchase of the 1989 Mazda, and a Missouri application for title for that vehicle. He also signed either the title to the 1983 Mazda or a power of attorney. He received the certificate of origin to the 1989 Mazda. Seth agreed to return the next day with a power of attorney from his wife covering the jointly owned 1983 Mazda. That vehicle he left with the dealer and proceeded home in the new truck. On the way home the accident occurred.

The trial court found that the 1989 Mazda was an "additional" vehicle under the special policy and Seth therefore had uninsured motorist insurance from Cameron covering three vehicles, which could be stacked to cover his injuries. It further found ambiguity in both policies as to the per person/per

accident limitations thereby allowing Kathy to recover $25,000 in consortium damages for each of the vehicles covered by the two policies.

Cameron argues that Seth parted with ownership of the Hyundai before the accident and therefore that vehicle did not have uninsured motorist coverage at the time of the accident. The company does not contest on this appeal that Seth owned the 1989 Mazda and the 1983 Mazda at the time of the accident. In *Cameron Mutual Insurance Company v. Madden,* 533 S.W.2d 538 (Mo. banc 1976) the court held that the public policy expressed in § 379.203 RSMo 1986, prohibited the insurer from limiting the insured to recovery under only one of the uninsured motorist coverages which were provided for each of two cars covered by a single policy and for which separate premiums were charged. We will deal with the "separate premium" issue subsequently. Under *Cameron,* if two vehicles are insured under the same policy the uninsured motorist coverages may be "stacked" to provide essentially double coverage under the policy.

■ In this state the law regarding the sale of vehicles provides that the owner shall endorse an assignment on the certificate of ownership and "deliver the same to the buyer at the time of the delivery to him of such motor vehicle." § 301.210.1 RSMo 1992 Supp. Absolute technical compliance with the statute is required, otherwise the sale is fraudulent and void. *Horton v. State Farm Fire and Casualty Co.,* 550 S.W.2d 806 (Mo. App.1977) [1–3]. Failure to comply strictly with the statute means no title passes and the purported owner has no ownership. *Id.* Seth did not deliver the Hyundai to the dealer before the accident. The dealer collected the vehicle from the Oliver residence two days after the accident. It was, during that period, available to Mrs. Oliver for her use. Seth did not assign the certificate of ownership to the dealer on the day that he purchased the new Mazda, but instead gave the dealer his power of attorney to assign the title, which was then in the possession of the lienholder. There is no disagreement that the dealer could not have exercised its power of attorney to assign the title until October 25, when the lienholder released its lien. At the time of the accident Seth and the dealer had not complied with the statute. There is no question that the dealer had certain equitable rights in the vehicle and was in a position to obtain title to the vehicle without further action by Seth. We are unable to conclude, however, that the "reasonably contemporaneous" concept articulated in *State Farm Mutual Automobile Insurance Co. v. MFA Mutual Insurance Co.,* 485 S.W.2d 397 (Mo. banc 1972) [l.c. 400] and *Faygal v. Shelter Insurance Co.,* 689 S.W.2d 724 (Mo.App. 1985) [2] applies here. Legal title had not been transferred at the time of the accident and the vehicle was still owned by Seth and therefore covered under the policy. Seth maintained physical dominion over the vehicle and did not surrender it until after the accident. There was no reasonably contemporaneous delivery of possession of the vehicle and delivery of a properly completed and acknowledged assignment of title. Seth owned the Hyundai at the time of the accident.

■ Cameron next asserts that the 1989 Mazda was not an "additional" vehicle under the "special" policy but rather was a "replacement" vehicle. The policy provided that it covered the Hyundai and any vehicle that Seth replaced it with. The policy also promised to "insure any additional car you acquire if we insure, under this insurance, all cars you own." If the Mazda was a "replacement" vehicle then only one vehicle was insured under the "special" policy at the time of the accident. If the Mazda was an "additional" vehicle then two vehicles were insured. Both replacement and additional vehicles are covered under the policy if within thirty days the company is informed of their existence. No issue is raised of the company being timely advised. In *Beck Motors Inc. v. Federal Mutual Insurance Company,* 443 S.W.2d 200 (Mo.App.1969) [4] we described the difference between "replacement" and "additional" in the following terms:

> [The] policy provision is not intended or interpreted to provide coverage for an additional vehicle. To so interpret would allow coverage on two vehicles for the premium on one. It is not necessary for

us to determine the precise limits at which a vehicle becomes "additional" rather than "replacement". But without setting hard and fast rules, it is necessary, in order for the provision to apply, that the newly-acquired vehicle take the place of the described car and the described car be treated thereafter in such fashion that it is clearly apparent it has been replaced and is no longer covered by the policy. Notification to the company of a replacement, of course, is such treatment and clearly establishes what vehicle is covered. Disposition of the vehicle, or it being and remaining in an inoperable condition also presents concrete evidence of the change of coverage. There may be other possibilities of treatment which would establish that the vehicle has been replaced. But the insurance company may not be held except upon a clear showing of replacement, nor in a circumstance where the insured could show that either car was covered, depending on which one was involved in the accident.

Here the policy provides for coverage for both additional and replacement vehicles. Cameron had not been notified that the vehicle was either a replacement or additional vehicle at the time of the accident nor was it required to be at that time. The vehicle was not in inoperable condition and it was not treated by the Olivers as if it had been replaced. Nothing made it clearly apparent that the Hyundai had been replaced by the Mazda. It is proper here to conclude that the Mazda was at different times both an additional vehicle and a replacement vehicle. Prior to the transfer of possession of the Hyundai to the dealer the Mazda was an additional vehicle under the policy. Upon transfer of possession it became a replacement vehicle. At the time of the accident it was an "additional" vehicle under the policy.

■ Cameron also relies upon the language of the original *Cameron* case, *supra*, that premised allowance for stacking upon the concept that separate premiums were paid for the two vehicles. We are not convinced that language was intended to impose a restriction based upon the appearance of a separate charge in the declarations section of the policy. Here, however, the evidence does not establish that no premium was charged for the "additional" vehicle coverage. All coverages provided by a policy are presumably included in the premium, either directly or indirectly. We can assume that uninsured motorist coverage for additional vehicles is built into the basic premium charge and is further subject to billing after the notification to the company within the thirty day period. Uninsured motorist coverage of an additional vehicle is not to be defeated because the accident occurs within the notification grace period provided in the policy. No question is raised that the injuries sustained by Seth exceeded the amount of the three stacked coverages. The trial court correctly awarded that amount to Seth under the policies.

■ We turn now to the consortium claim of Kathy Oliver. Again no question is raised that her total loss of consortium damages exceeded $75,000. We first look to the claims under the "special policy". For the reasons we have already delineated two vehicles were insured under that policy and two uninsured motorist coverages were provided. Cameron contends that the "per person/per accident" provisions of the policy prohibit recovery by Seth and Kathy for bodily injuries to Seth in an amount totaling more than $25,000 for each vehicle. The parties have discussed at length whether the limitation provision is ambiguous or not. The relevant provisions of the policy are as follows:

General definitions:

**You, your, yourself** means the person named on the declarations page and that person's husband or wife if a resident of the same household.

**Damages** means the cost of compensating those who suffer bodily injury or property damage from a **car accident.**

Uninsured motorist provisions:

**We** promise to pay the **damages you're** legally entitled to receive from the owner or operator of an uninsured **motor vehicle** because of bodily injury. **We'll** pay these **damages** for bodily injury **you** suffer in a **car accident** while **occupying a car** or, as a pedestrian.

This insurance covers bodily injury, *including loss of services*, sickness, disease

or death which results from the injury, caused by a **car accident** and suffered by **you.** (Emphasis supplied.)

The limit of uninsured motorist insurance shown on the declarations page for "each person" is the maximum **we'll** pay in **damages** for bodily injury to any one person.

■ Kathy is by definition an insured under the policy. There is no dispute that Seth was injured in a car accident. As Seth's wife Kathy is by operation of law entitled to recover from the operator of an uninsured vehicle damages for loss of consortium which are the loss of services. The policy identifies loss of services as included within the term "bodily injury." See underlined section above. Parties may utilize terms in a policy as they see fit, subject to possible statutory restrictions, and whether a definition chosen is the usual meaning of the term or not the parties will be bound by the definition they choose. *See, for example, State ex rel. Missouri Pacific Railroad Company v. Koehr,* 853 S.W.2d 925 (Mo. banc 1993). Kathy therefore has damages for bodily injury as that term is used in the policy. Even under Cameron's reading of the limitation section the limitation is imposed as to the persons sustaining bodily injury. The policy defines Kathy's damages as bodily injury damages. She is therefore entitled under the policy provisions to recover her "bodily injury" damages and those damages are separate from those of her husband. The limitation does not apply. At a minimum the language is ambiguous and in that posture must be interpreted in favor of the insured. The trial court did not err in determining that Kathy was entitled to recover under the "special policy."

■ Cameron also challenges the trial court award to Kathy under the regular policy. The limitation provision of that policy states, "The limit of bodily injury liability stated in the declarations as applicable to 'each person' is the limit of the company's liability for all damages, including damages for care and loss of services, arising out of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by one person as the result of any one accident." In dealing with these limitation provisions the courts of this state have consistently taken the position that the term "sustained" when utilized as it is here is ambiguous because it cannot be determined whether the intended antecedent is "damages" or "bodily injury". *Cano v. Travelers Insurance Co.,* 656 S.W.2d 266 (Mo. banc 1983) [5,6]; *Anderson v. Saint Paul Mercury Insurance Co.,* 792 S.W.2d 440 (Mo.App. 1990) [2]; *Spaete v. Automobile Club Inter-Insurance Exchange,* 736 S.W.2d 480 (Mo. App.1987) [1]. The language here suffers from the same ambiguity. Such ambiguity is resolved against the insurer. The trial court did not err in finding coverage to Kathy under the regular policy.

■ Finally Cameron challenges the awarding of vexatious refusal to pay damages and attorney's fee by the trial court. To recover for vexatious delay in refusing to pay on an insurance claim, the insured must show that the insurer's refusal was willful and without reasonable cause. *Joachim Savings and Loan Ass'n. v. State Farm Fire and Casualty Co.,* 764 S.W.2d 648 (Mo.App.1988) [6–8]. When there is an open question of law or fact the insurer may insist upon a judicial determination of those questions without being penalized. *Id.* However, the existence of a litigable issue will not necessarily preclude a penalty for vexatious delay if there is evidence that the insurer's attitude was vexatious and recalcitrant. *Id.*

■ Shortly after the accident Cameron issued a check for $2,000 to the Olivers as an advance payment under the uninsured motorist coverage of the special policy on the new Mazda. Cameron declined Seth's demand that he be paid $75,000 for three vehicles covered by the two policies. Following review of Seth's medical records, Cameron then sent a check for $23,000 to Olivers' counsel, payable to counsel and both Olivers. This check was returned with instructions that it be reissued payable only to counsel and Seth because Seth was clearly entitled to the undisputed limits of the "special policy" covering at least one vehicle. Cameron sent the same check back to respondents' counsel. The check was again returned with the same request, accompanied by a warning that vexatious delay penalties would be sought and that Kathy had her own separate claim for consortium. The same check was again sent to counsel and was again returned with in-

structions not to send it back. It is clear that the injuries sustained by Seth indicated to the company that the full $25,000 under the "special policy" was due him for his injuries alone. Recovery to Seth under the "regular policy" also appeared called for as Kathy had not assigned her interest and title had not passed. Whatever Cameron's legal position on the remaining disputes, it is apparent it attempted to force a relinquishment of Kathy's claim by refusing payment of Seth's clearly warranted claim under the "special policy." The trial court could and did find that such conduct, repeated three times, evidenced an attitude of recalcitrance and vexatiousness by Cameron. Determination of a vexatious attitude is a fact question subject to review on the same basis as any other fact question. *See Still v. Travelers Indemnity Co.*, 374 S.W.2d 95 (Mo.1963) [12]. If based upon evidence which supports it, and unless against the weight of the evidence or contrary to the law, it is to be affirmed. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). There is evidence to support the trial court finding of vexatiousness.

Judgment affirmed.

GARY M. GAERTNER, P.J., and STEPHAN, J., concur.