2007-NMCA-088

165 P.3d 343

**Scott and Shana BIRD, Husband and Wife, Plaintiffs–Appellees/Cross–Appellants,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant–Appellant/Cross–Appellee.**

No. 26,688.

Court of Appeals of New Mexico.

May 31, 2007.

Certiorari Denied, No. 30,485, July 16, 2007.

The Titus & Murphy Law Firm, Victor A. Titus, Farmington, NM, for Appellees/Cross–Appellants.

Guebert, Bruckner & Bootes, P.C., Don Bruckner, Anita X. Tellez, Albuquerque, NM, for Appellant/Cross–Appellee.

## OPINION

CASTILLO, Judge.

{1} In this case, we consider the extent of coverage afforded a vehicle covered under the "newly acquired car" provision of an automobile insurance policy. We also address questions concerning double costs, pre-judgment interest, attorney fees, and the rate of post-judgment interest imposed in this case. As to the coverage question, we conclude that under the circumstances of this case, the policy provided additional uninsured motorist (UM) coverage on the newly acquired car and that the coverage could be stacked. Therefore, we affirm on this issue. We further conclude that the trial court did not err in awarding costs; nor did it err in declining to award pre-judgment interest and attorney fees. Finally, we determine that the appropriate rate of post-judgment interest is 8.75%. We thus affirm in part and reverse in part on these issues.

## I. BACKGROUND

{2} This case arises from a claim for benefits made by Appellees/Cross–Appellants, Scott and Shana Bird (Parents), after their son, David, was killed in an automobile accident. The material facts are undisputed. The Bird family had four automobile insurance policies with Appellant/Cross–Appellee, State Farm Mutual Automobile Insurance Company (State Farm), at the time of the accident on May 12, 2004. Each policy carried liability and UM coverage of $100,000 per person. Each policy provided thirty-day coverage for a newly acquired car. Prior to April 20, 2004, David drove a Jeep Cherokee (Jeep), which was insured as a named vehicle on one of the four policies. On April 20, 2004, David informed his State Farm agent, Ron Goimarac, that he had purchased a Subaru and that he was trying to sell the Jeep. At that time, the Subaru became the named vehicle on the policy that had originally named the Jeep. Mr. Goimarac informed David that the Jeep would continue to be covered under the terms of the Subaru policy for thirty days but that he would need to obtain a new policy on the Jeep for coverage to continue beyond the thirty-day period. During the thirty-day period, David was riding as a passenger in the Subaru and was killed in an automobile accident.

{3} Parents made a demand for UM coverage on all five cars covered by their State Farm policies. State Farm paid Parents a total of $400,000, consisting of $100,000, based on the per person limit of coverage under the Subaru policy for liability on the driver of the Subaru, and $300,000 in stacked UM coverage under the other three policies. The UM coverage for the Subaru was fully offset by the payment of liability to the coverage limits on the Subaru policy. Therefore, State Farm denied Parents' claim for benefits due under the UM coverage on the Jeep.

{4} Subsequently, Parents filed a petition for declaratory judgment, seeking an additional $100,000, based on the UM coverage on the Jeep. The parties stipulated that Parents' damages exceed $500,000. The parties filed cross-motions for summary judgment. The trial court granted summary judgment in favor of Parents in the amount of $100,000. The court also awarded $613.62 in costs to Parents but denied their motion for attorney fees and pre-judgment interest. In the judgment, the trial court made several findings, including one finding that there was no indication State Farm acted in bad faith or unreasonably in failing to pay the claim.

{5} After the case on appeal was assigned to this Court's general calendar, the trial court entered an order awarding Parents post-judgment interest at 15%, pursuant to NMSA 1978, § 56–8–4 (2004). State Farm filed a motion to include in this appeal the issue regarding the rate of post-judgment interest. This motion was granted. Thus, on appeal, State Farm raises two issues— whether the coverage extended to the Jeep, pursuant to the Subaru policy, created additional UM coverage that could be stacked and whether Parents are entitled to 15% post-judgment interest. Parents cross-appeal the trial court's award of costs and the denial of Parents' motion for attorney fees and pre-judgment interest.

{6} We begin by addressing the coverage extended to the Jeep under the Subaru policy. We then discuss the trial court's rulings regarding attorney fees, pre-judgment interest, and double costs. Finally, we address the trial court's award of post-judgment interest. We detail additional facts, including the pertinent terms of the policy, as we address each argument below.

## II. DISCUSSION

### A. Extent of Coverage

{7} Summary judgment is proper when the material facts are undisputed and the only remaining issues are questions of law. *Rehders v. Allstate Ins. Co.*, 2006–NMCA–058, ¶ 12, 139 N.M. 536, 135 P.3d 237, *cert. dismissed*, 2007–NMCERT–007, 142 N.M. 346, 165 P.3d 343. We review the trial court's grant of a summary judgment motion de novo. *Id.* Insurance contract interpretation also presents a question of law, which we review de novo. *See Rummel v. Lexington Ins. Co.*, 1997–NMSC–041, ¶ 60, 123 N.M. 752, 945 P.2d 970.

{8} When granting Parents' summary judgment motion, the trial court entered judgment in their favor for $100,000. State Farm contends that the judgment should be reversed because Parents are "not entitled to stack based upon the number of vehicles that may be entitled to coverage at a particular time." State Farm does not argue that the policy is unambiguous. Rather, State Farm contends that by "[u]sing the rationale by the Supreme Court in *Monta[ñ]o* [*v. Allstate Indemnity Co.*, 2004–NMSC–020, 135 N.M. 681, 92 P.3d 1255], the amount of stacked coverage is determined by looking to the contractual expectations of the insured, which [are] tied to the number of policies and number of premiums—not the number of vehicles that may actually be entitled to coverage at a particular time, depending upon when an insured decides to sell one vehicle to obtain another, and holds onto the old vehicle for a short period of time in the process." *Montaño* is not dispositive in this case because we are not dealing with a limitation-of-stacking clause—the issue in *Montaño*. *See* 2004–NMSC–020, ¶¶ 5, 19–21, 135 N.M. 681, 92 P.3d 1255 (holding that when an insurance policy contains an anti-stacking clause, the insurance company must obtain a written rejection of UM coverage for each additional vehicle covered by a policy, in order to clarify the insured's expectations and to make certain that the insured gets only what he or she has paid for). Rather, the issue at hand is whether the coverage that was extended to the Jeep under the newly acquired car provision of the Subaru policy constituted coverage separate and apart from the limits of coverage on the Subaru. If so, then the payment of policy limits on the Subaru would not affect the availability of UM coverage on the Jeep, and this coverage could be stacked, resulting in an additional $100,000 in coverage. To address this issue, we do a traditional contract analysis. *See Rummel*, 1997–NMSC–041, ¶ 18, 123 N.M. 752, 945 P.2d 970; *see also Montaño*, 2004–NMSC–020, ¶ 22, 135 N.M. 681, 92 P.3d 1255 (relying on a traditional ambiguity analysis). We apply principles of contract construction while bearing in mind the UM statute. *See Rummel*, 1997–NMSC–041, ¶ 18, 123 N.M. 752, 945 P.2d 970 ("[A]bsent a statute to the contrary, insurance contracts are construed by the same principles which govern the interpretation of all contracts." (internal quotation marks and citation omitted)).

**1. Policy Provisions**

{9} We begin with the pertinent policy provisions. The coverage in question is provided pursuant to an automatic insurance clause, which provides coverage for a new vehicle acquired by the insured. *See generally* 8A Lee R. Russ et al., *Couch on Insurance* §§ 117:2,:3 (3d ed.2005) (stating that an automatic insurance clause is for the benefit and the convenience of the insured and that this provision should be construed liberally in favor of the insured). The coverage language in this case is found in the definitions section of the policy:

*Newly Acquired Car*—means a *replacement car* or an *additional car.*

*Replacement Car*—means a *car* purchased by or leased to *you* or *your spouse* to replace *your car.* This policy will only provide coverage for the *replacement car* if *you* or *your spouse:*

1. tell us about it within 30 days after its delivery to *you* or *your spouse;* and

2. pay us any added amount due.

*Additional Car*—means an added *car* purchased by or leased to *you* or *your spouse.* This policy will only provide coverage for the *additional car* if:

1. it is a *private passenger car* and we insure all other *private passenger cars;* or

2. it is other than a *private passenger* [*car*] and we insure all *cars* owned or leased by *you* or *your spouse* on the date of its delivery to *you* or *your spouse.*

This policy provides coverage for the *additional car* only until the earlier of:

1. 12:01 A.M. Standard Time at the address shown on the declarations page on the 31st day after the delivery of the *car* to *you* or *your spouse;* or

2. the effective date and time of a policy issued by us or any other

company that describes the *car* on its declarations page.

*You* or *your spouse* may apply for a policy that will provide coverage beyond the 30th day for the *additional car*. Such policy will be issued only if both *you* and the vehicle are eligible for coverage at the time of application.

{10} The language quoted above states that coverage will be provided for a newly acquired car by this policy under certain conditions. State Farm does not dispute that the conditions of coverage have been met. Moreover, State Farm admits that any distinction between a "replacement car" and an "additional car" is immaterial to the issue raised in this case. We see no need to refer to either "replacement" car or "additional" car in our analysis; thus we refer to a "newly acquired car" when discussing the policy, and refer to "the Jeep" when being specific as to the vehicle coverage at issue in this case.

## 2. Principles of Insurance Contract Analysis

{11} The first question in analyzing an insurance policy is whether the policy is ambiguous. *See Battishill v. Farmers Alliance Ins. Co.*, 2006–NMSC–004, ¶ 17, 139 N.M. 24, 127 P.3d 1111. A court may find that an ambiguity exists if separate sections of the policy conflict, if the language may have more than one meaning, if the structure of the contract is not logical, or if a relevant matter of coverage is not explicitly addressed in the policy. *Rummel*, 1997–NMSC–041, ¶ 19, 123 N.M. 752, 945 P.2d 970. The issue in this case turns on the extent of coverage provided for the Jeep—whether the policy provides additional coverage for the named vehicle or whether one limit of coverage applies to the Subaru and the Jeep together. State Farm does not appear to challenge the ambiguous nature of the policy, in that State Farm has identified no policy language addressing coverage in these circumstances. In the absence of any express policy terms addressing the extent of coverage issue, there is no question that the policy provisions for a newly acquired car are ambiguous in this regard. *Id.* (stating that an ambiguity exists when a "particular matter of coverage is not explicitly addressed by the policy").

{12} When an ambiguity exists in the pertinent language of a policy, we look first to other terms of the policy in order to resolve the issue. *Id.* ¶ 20. If the ambiguity cannot be resolved by examining the other policy provisions, we look to extrinsic evidence, such as the premiums paid, the circumstances surrounding the agreement, the parties' conduct, and the parties' oral expressions of intent. *Id.* ¶ 21. Generally, ambiguities in an insurance policy are construed in favor of the insured and against the insurer, as a matter of public policy. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶ 26, 129 N.M. 698, 12 P.3d 960. Our construction of an unclear and ambiguous insurance policy is therefore guided by the reasonable expectations of the insured. *Id.*; 16 Richard A. Lord, *Williston on Contracts* § 49:20, at 112 (4th ed. 2000) ("The reasonable expectations doctrine has been said to be consistent with the rule that ambiguous language in an insurance policy is to be liberally construed in favor of the insured and against the insurer[.]" (footnote omitted)).

{13} While there is no language specifically describing the extent of coverage provided for a newly acquired car, the policy does provide direction in other areas. We review these provisions for assistance in resolving the ambiguity. *See Rummel*, 1997–NMSC–041, ¶ 20, 123 N.M. 752, 945 P.2d 970 ("If any provisions appear questionable or ambiguous, we will first look to whether their meaning and intent is explained by other parts of the policy."). For example, the policy states that if comprehensive or collision coverage is not otherwise afforded by any policy, coverage on a newly acquired car will be provided for approximately six days after delivery of the car. This same paragraph further states that the coverage is subject to a $500 deductible. Liability coverage is limited "to the use, by an *insured*, of a *newly acquired car*." Another policy provision eliminates liability coverage for a newly acquired car when coverage is provided under another policy. Similarly, if another policy provides miscellaneous coverages, including

medical payments, comprehensive, collision, and car rental for a newly acquired car, this policy will not provide those coverages for that car.

{14} We also look to the policy provision regarding trailer coverage because this language specifically informs the insured about coverage limits. As to covered trailers, the policy specifically provides that "[t]hese trailers are not described in the declarations and no extra premium is charged." Under the limits of liability section, language in the policy provides that "[a] motor vehicle and attached trailer are one vehicle. Therefore, the limits are not increased." Thus, the policy explicitly limits the coverage provided a trailer to the coverage provided by the vehicle to which the trailer is attached. State Farm contends that coverage for a newly acquired car is similarly limited to the coverage provided by the named vehicle. The policy clearly informs the insured of the limitation on trailers; yet, the policy is silent regarding a comparable limitation on newly acquired cars.

{15} From our review of the policy, we find no additional provisions that address the coverage limits on newly acquired cars; therefore, the ambiguity remains unresolved. Accordingly, we now look to extrinsic evidence, including the premiums paid, the circumstances surrounding the agreement, the parties' conduct, and the parties' oral expressions of intent. *See Rummel*, 1997–NMSC–041, ¶ 21, 123 N.M. 752, 945 P.2d 970.

### 3. Extrinsic Evidence

### a. Premiums Paid

{16} State Farm argues that because Parents had four policies and paid four premiums, Parents' reasonable expectations have been met, since "they have received payment on the stacked coverages for which they have paid." Each policy issued by State Farm named one vehicle, and one premium was paid for each policy. Although Parents were not charged an additional premium for the coverage extended to the Jeep under the Subaru policy, Mr. Goimarac testified in his deposition that coverage for a newly acquired car is built into the premium base paid for the named vehicle.

### b. Circumstances, Conduct, and Oral Expressions of Intent

{17} First, we review the circumstances surrounding the agreement. The Bird family insured all of their vehicles with State Farm through Mr. Goimarac and had done so for many years. The Bird family has had a relationship with Mr. Goimarac for almost as long as he has been an insurance agent, which is twenty-six years. Over the years, Mr. Goimarac established a "trust relationship" with the Bird family. Before the Subaru was purchased, the Bird family insured four vehicles under four separate policies with State Farm, each of which provided UM coverage. The bill for the Bird family's auto insurance, which was included with the bills for home and life insurance, was paid monthly by automatic draft from Mr. Bird's checking account.

{18} Evidence of the parties' conduct and of their oral expressions of intent is provided in the depositions of Mr. Goimarac and his associate and in Mr. Bird's two affidavits. Mr. Goimarac's associate, Sara Terneuzen, testified to the following facts in her deposition. When David purchased the Subaru, he spoke with Ms. Terneuzen to arrange for insurance. Although Ms. Terneuzen had no specific recollection of her conversation with David, she stated that generally, when someone calls and tells her that they have a new car and will be trying to sell the old one, she informs them of two options. An insured can make a change on the policy to add the new vehicle and thereby cover the old car for thirty days from the date of purchase of the new vehicle; if the car does not sell within thirty days, then the insurance company can "add it back on at that time." In the alternative, if the insured thinks it will take longer than thirty days to sell the old car, it can be added on immediately. Ms. Terneuzen further stated that she did not recall discussing with David that one limitation of coverage covered both vehicles; nor did she recall discussing coverages with Mr. Bird. Finally, Ms. Terneuzen stated that David did not sign a rejection of UM coverage.

{19} In Mr. Bird's first affidavit, he stated that David, through Mr. Goimarac, "set up the insurance on the Subaru so that both [vehicles] would be insured while [David] tried to sell the 1999 Jeep." Mr. Bird also stated that it was his expectation that both of David's cars, the Subaru and the Jeep, would be fully insured until the Jeep was sold and that State Farm would automatically debit his checking account for the cost of fully insuring both vehicles.

{20} In Mr. Goimarac's deposition, he did not dispute Mr. Bird's expectation that both the Subaru and the Jeep would be fully insured for thirty days. Mr. Goimarac stated that he informed Mr. Bird that the same coverage provided the Subaru would be extended to the Jeep for thirty days. Mr. Goimarac also stated that the Bird family had five insurance cards, two of which had the same policy number. He further stated that he ordinarily informs an insured that for thirty days, a new car will have "the exact same coverage" as the named vehicle on the policy. However, Mr. Goimarac also testified in his deposition that although both cars were covered, "they did not have an additional amount of insurance other than what was on that Subaru." He further explained, "[T]he same insurance on the Subaru would have extended to the other vehicle, but you can't collect the same amounts off of both vehicles at the same time." Specifically, Mr. Goimarac observed that if multiple accidents occurred involving both vehicles, the limits of coverage would be the limits of the one policy—"only one [$]100,000 limit during that 30–day policy period." He stated that he explained this to Mr. Bird by using "the exact words [he] would use with anybody, which [are ']you have coverage extended for a period of 30 days from the . . . Subaru policy.[']" Mr. Goimarac admitted that the limit of liability, as applied to both cars, is not explained in the policy and that any information in regard to this limit would have had to come from communications with his office. Finally, Mr. Goimarac testified that neither he nor Ms. Terneuzen discussed with the Bird family the difference in limits of liability for one policy versus two policies.

{21} In response to Mr. Goimarac's deposition testimony, Mr. Bird filed a second affidavit. In this affidavit, Mr. Bird stated that he did not understand from Mr. Goimarac's explanation, at the time the Subaru was insured, that the thirty-day extension of the Jeep's coverage "was an extension of the same [Subaru] policy." Mr. Bird had no recollection of Mr. Goimarac's explaining the term "extended." Moreover, according to Mr. Bird, the term "fully insured" was not explained to be "the same insurance coverage" as that provided for the named vehicle. Mr. Bird further stated that he did not "recall the policy that extended coverage on the Jeep being called replacement or extension" and that after he talked with Mr. Goimarac, Mr. Bird assumed that the policy "was additional coverage." Finally, he said, "Based on the explanation to me, I expected full coverage meant just that—the Subaru would have the same policy limits as the Jeep during the 30[-]day period[,] and I either had been or would be charged a premium for this additional coverage."

## 4. Reasonable Expectations

{22} We cannot conclude that the foregoing facts—regarding the premiums paid, the circumstances surrounding the agreement, and the parties' conduct and oral expressions of intent—support State Farm's position. It is clear that State Farm intended one limit of coverage to apply to both cars; however, this intention was never communicated to the Bird family. *See Phoenix Indem. Ins. Co. v. Pulis*, 2000–NMSC–023, ¶ 23, 129 N.M. 395, 9 P.3d 639 ("When there is ambiguity [in an insurance contract] . . . the test is not what the insurer intended its words to mean, but what a reasonable person in the insured's position would have understood them to mean." (internal quotation marks and citation omitted) (alteration in original)). The Bird family, relying on the trust relationship established over many years with Mr. Goimarac, reasonably expected "full coverage" on both vehicles. To apply the limits of liability to both cars diminishes the coverage on both vehicles. Thus, Mr. Goimarac's assurance that both cars were fully covered is inconsistent with State Farm's assertion that the one limit of coverage applied to both the Subaru

and the Jeep. *Cf. Teague–Strebeck Motors, Inc. v. Chrysler Ins. Co.,* 1999–NMCA–109, ¶ 1, 127 N.M. 603, 985 P.2d 1183 (observing that the defendant did not contest that it was bound by its agent's representations of more coverage than provided by the policy), *overruled on other grounds, Sloan v. State Farm Mut. Auto. Ins. Co.,* 2004–NMSC–004, ¶ 6, 135 N.M. 106, 85 P.3d 230. Moreover, a reasonable insured who is told that a different policy must be obtained for the Jeep after thirty days, in order to continue the coverage currently provided under an existing policy, would conclude that there is no difference in coverage before and after the thirty days. Based on the above, we conclude that the trial court did not err when it determined that the Bird family reasonably expected to be able to stack the UM coverage provided for the Jeep under the Subaru policy.

{23} State Farm argues that the reasonable expectations of the insured rest on the number of policies and the number of premiums, not on the number of vehicles insured. We are not persuaded by this argument. As observed earlier, Mr. Bird stated in his affidavit that he expected full coverage and that he expected that State Farm would automatically debit his account for any additional premium necessary to provide full coverage. Under these circumstances, we cannot say that the Bird family knew they had only paid four premiums for four coverages. Significant to this argument is Mr. Goimarac's testimony that the premium base was calculated by considering the coverage provided for newly acquired cars and that such coverage was therefore part of the premium base that had already been paid. *Cf. Montaño,* 2004–NMSC–020, ¶ 27, 135 N.M. 681, 92 P.3d 1255 ("Compounding the ambiguity is the fact that [the defendant], in setting its premium, admits that it has factored into its premium calculation the average number of vehicles on all multi-vehicle policies, including those policies insuring three or more vehicles."). State Farm acknowledges the existence of a premium built into the premium base but argues that it is consideration paid "only for the right to extend coverage" and "not for the creation of a new and separate policy with separate limits of liability." We do not dispute State Farm's assertion. However, in light of our determination that the policy terms were ambiguous and that the extrinsic evidence indicates the Bird family reasonably expected full coverage of both vehicles, this assertion is not dispositive. *See Rummel,* 1997–NMSC–041, ¶ 23, 123 N.M. 752, 945 P.2d 970 ("In order to refute these presumptions in favor of the insured, the insurer must be able to give evidence that supports the construction for which it advocates. The insurer's interpretation, especially when it concerns an exclusion to the overall coverage, must be clearly expressed in the policy." (citation omitted)); *cf. Montaño,* 2004–NMSC–020, ¶ 15, 135 N.M. 681, 92 P.3d 1255 ("Our public policy in support of stacking . . . has always been tied to the notion that it is unfair not to allow stacking when multiple premiums are paid *or* when the policy is otherwise ambiguous." (emphasis omitted; emphasis added)).

{24} Our conclusion that payment of separate premiums is not determinative in our case is supported by the Missouri Court of Appeals decision in *Oliver v. Cameron Mutual Insurance Co.,* 866 S.W.2d 865 (Mo.Ct. App.1993). In *Oliver,* the court held that the insureds were entitled to stack three UM coverages, based on two policies insuring two named vehicles and an unnamed vehicle insured as an additional vehicle. *Id.* at 867, 869. The defendant insurer argued that stacking was premised on the concept that separate premiums were paid for multiple vehicles. *Id.* at 869. The court was not convinced that the payment of separate premiums was dispositive. *Id.* ("All coverages provided by a policy are presumably included in the premium, either directly or indirectly."). Under the circumstances of our case, we agree with the reasoning of the Missouri court.

{25} State Farm also argues that a change to a policy, such as an addition of a newly acquired car, "does not create a new policy[,] but rather constitutes a continuation of the old policy." In making this assertion, State Farm relies on *Vigil v. Rio Grande Insurance of Santa Fe,* 1997–NMCA–124, ¶ 15, 124 N.M. 324, 950 P.2d 297 ("When . . . an insured purchases a policy with a provision

that automatically covers any additional vehicle, there is no change in the insurance contract or the coverage purchased pursuant to that contract when a vehicle is added to the policy."). In *Vigil*, this Court held that a new rejection of UM coverage was not required when cars were added or when coverage was changed to include another vehicle in an existing policy. *Id.* ¶¶ 1, 3. The additional vehicle in *Vigil* was not covered by a newly acquired car provision; rather, a "change" was made to cover the car involved in the accident. *Id.* ¶ 3. After each change was made in the policy, the insureds in *Vigil* were mailed a declarations page expressly stating that they had rejected UM coverage. *Id.* These facts in *Vigil* are inapposite to the facts presented today. Thus, we are not persuaded that *Vigil* demands a conclusion different from the one we have reached today. In *Vigil*, UM coverage was rejected, and that decision applied to a new vehicle when it was added to the policy. *Id.* ¶ 14. We use this same premise in our case, where the Bird family purchased UM coverage; there is nothing to indicate that this coverage did not apply to the Jeep during the thirty-day coverage period.

{26} Finally, State Farm relies on *Rehders*, 2006–NMCA–058, ¶¶ 33–34, 139 N.M. 536, 135 P.3d 237, and *Berlangieri v. Running Elk Corp.*, 2002–NMCA–046, ¶ 13, 132 N.M. 92, 44 P.3d 538, to argue that the doctrine of reasonable expectations is not applicable under these facts. We disagree. In both *Rehders* and *Berlangieri*, this Court determined that the language of the policies was unambiguous. *Rehders*, 2006–NMCA–058, ¶ 34, 139 N.M. 536, 135 P.3d 237; *Berlangieri*, 2002–NMCA–046, ¶ 14, 132 N.M. 92, 44 P.3d 538. Because we have already determined that the language of the policy in our case is ambiguous, we conclude that neither *Rehders* nor *Berlangieri* is helpful to our analysis here.

## B.  Double Costs, Attorney Fees, and Pre–Judgment Interest

{27} The trial court awarded costs of $613.62 to Parents but denied their motions for pre-judgment interest and attorney fees. Parents challenge the court's rulings on these motions. We review the court's determinations regarding costs, attorney fees, and pre-judgment interest pursuant to Section 56–8–4 for abuse of discretion. *See* § 56–8–4(B) ("[T]he court in its discretion may allow interest of up to ten percent from the date the complaint is served[.]"); *Nava v. City of Santa Fe*, 2004–NMSC–039, ¶ 22, 136 N.M. 647, 103 P.3d 571 (discussing pre-judgment interest); *Marchman v. NCNB Tex. Nat'l Bank*, 120 N.M. 74, 94, 898 P.2d 709, 729 (1995) (addressing costs); *Smith v. McKee*, 116 N.M. 34, 36, 859 P.2d 1061, 1063 (1993) (addressing pre-judgment interest); *Jessen v. Nat'l Excess Ins. Co.*, 108 N.M. 625, 630, 776 P.2d 1244, 1249 (1989) (addressing attorney fees), *limited on other grounds, Sloan*, 2004–NMSC–004, ¶ 6, 135 N.M. 106, 85 P.3d 230. The trial court abuses its discretion when the reasons for denying pre-judgment interest are not ascertainable from the record or when the decision is contrary to logic and reason. *Gonzales v. Surgidev Corp.*, 120 N.M. 133, 150, 899 P.2d 576, 593 (1995); *Smith*, 116 N.M. at 36, 859 P.2d at 1063.

### 1.  Double Costs

{28} Parents argue that the trial court erred because it did not double the costs they incurred in prevailing below. When a claimant makes a settlement offer, Rule 1–068(A) NMRA provides for recovery of "double the amount of costs incurred after the making of the offer" if the offer is rejected and if the claimant thereafter obtains a judgment more favorable than the settlement offer. On November 29, 2005, Parents made an offer of judgment for $97,500. The trial court entered judgment on April 4, 2006, for $100,000 coverage, plus $613.62 in costs. Parents were therefore entitled to an award of double the costs incurred after the offer was made.

{29} Parents submitted a bill of costs for $486.82, which included a filing fee and a service fee, paid in January 2005, as well as costs incurred in conducting two depositions, one on October 19, 2005, and another on January 16, 2006. The exact date that the offer was made is unclear from the record. State Farm contends that service was on December 28, 2005. The offer of judgment was filed December 28, 2005. Therein, Par-

ents' counsel certified that the offer was mailed to State Farm on November 29, 2005. Under the facts, however, the exact date that the offer was made is not important. If we assume that the offer of judgment was made on November 29, 2005, Parents' only cost incurred after November 29 was for the second deposition, which was $126.80. Thus, it appears that the trial court awarded Parents the costs submitted, and it properly doubled the cost of the deposition taken after the settlement offer was made. Subtracting the bill of costs submitted, $486.82, from the costs awarded, $613.62, leaves a total of $126.80, which was the cost of the second deposition. We therefore conclude that the trial court did not err in awarding costs when it awarded the total costs submitted, as well as doubling the cost of the second deposition.

## 2. Attorney Fees

{30} Parents argue that the trial court erred when it denied their motion for attorney fees, made pursuant to NMSA 1978, § 39-2-1 (1977). The trial court may, in its discretion, award attorney fees to a prevailing party under Section 39-2-1, which provides that an insured person may be awarded attorney fees when the court finds "that the insurer acted unreasonably in failing to pay the claim."

■ {31} In our case, the trial court expressly found that there was no indication State Farm had acted in bad faith or unreasonably in failing to pay the claim. Parents argue that it was unreasonable for State Farm to create an expectation of full coverage and then deny Parents' claim after the loss of their son. *See United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 103 N.M. 480, 486, 709 P.2d 649, 655 (1985) (concluding that the defendant's failure to pay a claim was not unreasonable because the defendant "had a reasonable basis for questioning the amount of ... claimed damages"). We understand that Parents have suffered a tragic loss. However, we cannot agree that State Farm acted unreasonably because it denied part of Parents' claim at a time of such loss. Parents have provided no other evidence to support a finding of unreasonableness. Moreover, State Farm promptly paid $400,000 in benefits to Parents when the claim was made. With these facts, we cannot conclude that the trial court erred when it found State Farm did not act unreasonably. We therefore hold that the trial court did not abuse its discretion by declining to award attorney fees. *Cf. Jackson Nat'l Life Ins. Co. v. Receconi*, 113 N.M. 403, 421, 827 P.2d 118, 136 (1992) (concluding that the insurance company did not act unreasonably when the "denial of the claim was both non-frivolous and reasonable, even though it turned out ultimately to have been mistaken").

## 3. Pre-Judgment Interest

{32} Parents argue that the trial court erred when it did not award them pre-judgment interest pursuant to Section 56-8-4(B). Parents contend that the trial court erred because they did not delay the case and because State Farm has made no offer of settlement. In addition, Parents argue that State Farm's actions were selfish and unreasonable, in that it "drafted a contract of insurance which does not include exclusions [State Farm] seek[s] to read into it."

■ {33} "[T]he purpose of Section 56-8-4(B) is to foster settlement and prevent delay." *Gonzales*, 120 N.M. at 150, 899 P.2d at 593 (emphasis, internal quotation marks, and citation omitted); *see also Sunwest Bank of Albuquerque v. Colucci*, 117 N.M. 373, 378, 872 P.2d 346, 351 (1994) (same). Section 56-8-4(B) is a tool whereby the trial court may "ensure[ ] that the compensation due to a plaintiff is not unduly delayed by a defendant's dilatory practices." *Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 52, 131 N.M. 100, 33 P.3d 651; *see also Sunwest Bank*, 117 N.M. at 378, 872 P.2d at 351 ("Section 56-8-4(B) helps ease the burden on our crowded court system by fostering settlement and preventing delay."). The trial court is instructed to consider, among other things, whether the defendant previously made a timely and reasonable settlement offer and whether the plaintiff was the cause of unreasonable delay. Section 56-8-4(B). However, these two factors are not exclusive; the "court should take into account all relevant equitable considerations that further the goals of Section 56-8-4(B)."

*Gonzales*, 120 N.M. at 150, 899 P.2d at 593; *see also Sunwest Bank*, 117 N.M. at 377, 872 P.2d at 350 ("Section 56–8–4(B) allows prejudgment interest in the discretion of the court after the court considers, among other things, whether the plaintiff was the cause of unreasonable delay in the adjudication of his or her claims and whether the defendant had previously made a reasonable and timely offer of settlement.").

{34} *Abeita v. Northern Rio Arriba Electric Cooperative*, 1997–NMCA–097, 124 N.M. 97, 946 P.2d 1108, provides helpful guidance. In *Abeita*, the plaintiffs made an argument similar to that of Parents. The plaintiffs in *Abeita* argued that the trial court erred when it did not award pre-judgment interest, since the plaintiffs did not cause unreasonable delay and since the defendant made no timely and reasonable settlement offer. *Id.* ¶ 45. This Court affirmed the trial court's determination that an award of pre-judgment interest would not further the purpose of the statute. *Id.* ¶¶ 45–46. The trial court had determined that the defendant had not been the source of unreasonable delay and that difficult legal issues would probably preclude settlement. *Id.* ¶ 45. Thus, this Court held that the trial court's ruling was not without logic. *Id.*

{35} In our case, the trial court found no indication that State Farm acted unreasonably or in bad faith in failing to pay the claim. We can infer from this finding that the court below did not believe that State Farm was a source of unreasonable delay. Moreover, oral statements by the court indicate that it faced difficult legal issues, which could preclude settlement. Parents have pointed out no evidence to the contrary and do not argue that State Farm has engaged in dilatory tactics. Under these facts, the purposes of the statute would not be served by assessing pre-judgment interest. Thus, we conclude that the trial court did not abuse its discretion when it denied Parents' motion for pre-judgment interest.

## C. Post–Judgment Interest

{36} The trial court awarded post-judgment interest at a rate of 15%. Post-judgment interest is awarded from the date of entry of the judgment at the rate of 8.75% interest, unless (1) a contract provides a different rate of interest or unless "(2) the judgment is based on tortious conduct, bad faith or intentional or willful acts, in which case interest shall be computed at the rate of fifteen percent." Section 56–8–4(A); *see also Sunwest Bank*, 117 N.M. at 379, 872 P.2d at 352 ("Postjudgment interest on judgments and decrees for payment of money is mandatory and accrues at the statutory rate from the date of entry of judgment, unless the judgment is based on a written instrument bearing a different rate."). We review the court's application of Section 56–8–4(A) to the facts de novo. *See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.*, 2005–NMSC–030, ¶ 8, 138 N.M. 360, 120 P.3d 442.

{37} In the present case, the trial court reasoned that the judgment was based on the tortious conduct of the uninsured driver and that because the purpose of the UM statute is to put the insured in the same position in which he or she would have been had the tortfeasor had liability insurance, the insurer should be held liable for any interest that could have been imposed on the tortfeasor. The court relied on *Stewart v. State Farm Mutual Automobile Insurance Co.*, 104 N.M. 744, 726 P.2d 1374 (1986), which held that an insured may recover punitive damages from his insurer when he or she is legally entitled to recover them from an uninsured driver. *See id.* at 747, 726 P.2d at 1377.

{38} State Farm contends that the trial court erred in determining that the rate of post-judgment interest in this case is 15%, since the judgment was based on an insurance policy, which is a written instrument. State Farm argues that the exceptions to the 8.75% rate of interest do not apply because the policy does not specify a different rate of interest, the judgment does not arise in tort, and the trial court specifically found that State Farm did not act in bad faith. State Farm relies on *Diamond D*, 2001–NMCA–082, ¶ 55, 131 N.M. 100, 33 P.3d 651, to argue that the higher interest rate of 15% is an increased penalty warranted only when the trial court determines that the defendant needs "additional encouragement to timely pay the judgment debt," in light of the defen-

dant's previous culpable conduct. We agree with State Farm.

{39} We begin our analysis with *Teague–Strebeck,* 1999–NMCA–109, ¶ 61, 127 N.M. 603, 985 P.2d 1183, which concluded that the portion of the award based on bad faith should bear interest assessed at 15%. In *Teague–Strebeck,* the plaintiff argued that the judgment was based on tortious conduct because it was based on negligent misrepresentations made by the defendant's agent. *Id.* ¶ 63. This Court agreed with the defendant's claim that the cause of action arose out of contract because the trial court awarded damages measured by standard contract law. *Id.* ¶¶ 5, 64 (addressing the insurance company's failure to pay a claim and its bad faith delay and adjustment on other claims); *see also Stewart,* 104 N.M. at 748, 726 P.2d at 1378 ("An insurance policy is a contract and is generally governed by the law of contracts, and the rights and duties of the parties are to be determined by its terms." (internal quotation marks and citation omitted)). Thus, we held that 8.75% was the proper interest to be assessed on the contract damages.

{40} Like the trial court in *Teague–Strebeck,* the trial court in our case awarded damages based on the insurance contract—$100,000 in UM coverage. *See* 1999–NMCA–109, ¶¶ 63–64, 127 N.M. 603, 985 P.2d 1183 (observing that the plaintiff "was awarded the benefit of its bargain, the extent of insurance coverage promised by [the defendant's agent]"); *cf. Ellis v. Cigna Prop. & Cas. Cos.,* 1999–NMSC–034, ¶ 1, 128 N.M. 54, 989 P.2d 429 (holding that the six-year statute of limitations on a written contract is applicable to a cause of action based on a UM policy). We therefore conclude that 8.75% is the proper interest to be assessed on Parents' damages.

{41} Parents distinguish *Teague–Strebeck* by arguing that UM benefits "are based on tortious conduct (herein the willful and wanton acts of a drunk driver), and not the contract of insurance." *See generally Diamond D,* 2001–NMCA–082, ¶ 58, 131 N.M. 100, 33 P.3d 651 (stating that tortious conduct is "an act or omission that subjects an individual to liability under the principles of tort law"). Parents contend that a plaintiff's recovery is actually "the recovery of tort damages for the tortfeasor's negligence ... for which State Farm may pursue the tortfeasor." In support of this contention, Parents rely on two principles underlying the UM provisions. First, the UM statutes are intended to put the injured party in the same position in which he would be "if the tortfeasor were insured to the amount of stackable" UM coverage. Second, the UM statute must be liberally construed, and the only limitations on protection are those specifically set out in the statute itself—that the insured is legally entitled to recover damages and that the tortfeasor is uninsured. Parents assert that they reasonably expected to recover full coverage based on five vehicles and that if the tortfeasor would have had coverage equal to the five stacked UM coverages, he would have been liable for 15% post-judgment interest. Thus, Parents reason that State Farm should be liable for 15% post-judgment interest.

{42} We cannot agree. We do not believe that the legislature intended to hold insurance companies liable for 15% interest on a judgment, above and beyond the recovery limits of the policy, based on the tortious conduct of the tortfeasor. *See Stewart,* 104 N.M. at 747–48, 726 P.2d at 1377–78 (holding that the insured's recovery could not exceed the liability limitations of his policy, even though punitive damages were appropriate under the UM provision). As observed by State Farm, the imposition of post-judgment interest, pursuant to Section 56–8–4(A), serves to address the conduct of a defendant who is directly liable for the judgment. An award of post-judgment interest serves three purposes: compensating the "plaintiff for being deprived of compensation from the time of the judgment until payment ... by the defendant," discouraging unsuccessful defendants from pursuing frivolous appeals, and minimizing court supervision of the execution of judgments. *Diamond D,* 2001–NMCA–082, ¶ 51, 131 N.M. 100, 33 P.3d 651; *cf. id.* ¶ 56 (stating that punitive damages serve to deter and punish wrongful conduct that is committed by a culpable tortfeasor and holding that an award of 15% post-judgment

interest is not mandated by an award of punitive damages). Parents have failed to provide evidence of conduct on the part of State Farm that would support the imposition of post-judgment interest at 15%. *See id.* ¶ 53 (concluding that "the legislature intended to leave the appropriate rate of post-judgment interest to the discretion of the trial court in cases where a judgment is not based on tortious conduct, bad faith, or a specific finding of intention or willfulness, but where the evidence shows that a defendant's liability to a plaintiff is based on intentional or willful actions"). The purposes of Section 56–8–4(A) are not served by imposing post-judgment interest at 15% on State Farm, based on the tortious conduct of the uninsured motorist. Because Parents have failed to offer evidence of culpable conduct on the part of State Farm that would satisfy the requirements of Section 56–8–4(A) and trigger imposition of 15% post-judgment interest, we conclude that the trial court erred in awarding post-judgment interest at 15%.

## III. CONCLUSION

{43} We conclude that the insurance policy is ambiguous in regard to the limits of coverage on a newly acquired car and that the insured reasonably expected UM coverage on the Jeep to be separate and apart from coverage on the Subaru, which was the named vehicle. Thus, we affirm the trial court's grant of summary judgment in favor of Parents. We also conclude that the trial court did not err when it awarded costs and when it denied Parents' motions for attorney fees and pre-judgment interest; thus, we affirm on those matters. Finally, we conclude that the trial court's judgment was grounded in contract; thus, the court below erred in awarding post-judgment interest at 15%. Accordingly, we reverse the trial court's post-judgment order awarding 15% interest, and we remand for entry of an order consistent with this opinion.

{44} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and IRA ROBINSON, Judge.