# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:  2013-NMSC-017

Filing Date:  April 18, 2013

Docket No. 32,968

SUNNYLAND FARMS, INC.,

      Plaintiff-Petitioner,

v.

CENTRAL NEW MEXICO ELECTRIC COOPERATIVE, INC.,

      Defendant-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**John William Pope, District Judge**

Freedman Boyd Hollander & Goldberg, P.A.
Joseph Goldberg
Michael Lee Goldberg
Albuquerque, NM

The Walter K. Martinez Law Office
Kevin Martinez
Albuquerque, NM

Walter Kenneth Martinez, Jr.
Grants, NM

for Petitioner

Sparks, Willson, Borges, Brandt & Johnson, P.C.
Gregory V. Pelton
Colorado Springs, CO

Montgomery & Andrews, P.A.
Stephen S. Hamilton
Jaime R. Kennedy
Santa Fe, NM

1

for Respondent

**OPINION**

**CHÁVEZ, Justice.**

**{1}** This case comes before us because of a fire that destroyed a hydroponic tomato facility belonging to a new business, Sunnyland Farms, Inc. (Sunnyland). The day before the fire, Sunnyland's electricity had been shut off by its local utility, the Central New Mexico Electrical Cooperative (CNMEC), for nonpayment. Sunnyland's water pumps were powered by electricity, and without power, Sunnyland's facility had no water. Sunnyland sued CNMEC, alleging both that CNMEC had wrongfully suspended service, and if its electrical service had been in place, firefighters and Sunnyland employees would have been able to stop the fire from consuming the facility.

**{2}** After a bench trial, the trial court found CNMEC liable for negligence and breach of contract. The trial court awarded damages, including lost profits, of over $21 million in contract and tort, but reduced the tort damages by 80% for Sunnyland's comparative fault. It also awarded $100,000 in punitive damages. The parties cross-appealed to the Court of Appeals, which (1) reversed the contract judgment, (2) vacated the punitive damages, (3) held that the lost profit damages were not supported by sufficient evidence, (4) affirmed the trial court's offset of damages based on CNMEC's purchase of a subrogation lien, and (5) affirmed the trial court's rulings on pre- and post-judgment interest. *Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, 2011-NMCA-049, ¶¶ 2, 101, 119, 149 N.M. 746, 255 P.3d 324.

**{3}** Sunnyland appealed, and we granted certiorari. *Sunnyland Farms v. Cent. N.M.*, 2011-NMCERT-005, 150 N.M. 667, 265 P.3d 718. We affirm the Court of Appeals regarding the contract judgment, punitive damages, and interest, and reverse on the lost profit damages and the offset. We also take this opportunity to re-examine the standard for consequential contract damages in New Mexico.

**BACKGROUND**

**{4}** Sunnyland purchased its electricity from CNMEC. On September 8, 2003, CNMEC shut off electrical service to Sunnyland. Prior to disconnecting electricity for nonpayment, CNMEC ordinarily gives its customers notice that they have fifteen days to pay their overdue bills before service is suspended. It did not give Sunnyland this fifteen-day notice. The trial court record indicates a confusing array of possible billing irregularities, but it is not necessary to address them here because CNMEC does not contest the trial court's findings that it was negligent and that it breached its duty to Sunnyland.

**{5}** On the morning of September 9, 2003, before electrical service was restored, several Sunnyland employees engaged in arc welding near flammable materials, including cardboard

2

boxes. In doing so, they started a fire that ultimately consumed Sunnyland Farms' packhouse and operations building. When Sunnyland's employees initially discovered the fire, they attempted to put it out using ordinary hoses, but without electricity, the Sunnyland facility had no running water, and the fire grew. Sunnyland does not contest that its employees were negligent both in starting the fire and in reacting to it, for example, by failing to use a fire extinguisher.

**{6}** Someone living on Sunnyland's property called the fire department. Fire trucks arrived, but they were unable to access well water for firefighting because there was no electricity to power the pumps. Sunnyland had also failed to make alternative arrangements for emergency water in the event that power failed. Firefighters attempted to contact CNMEC to restore electricity to the water sources, but CNMEC employees expressed reservations to the emergency dispatcher, and the firefighters interpreted their statements as a threat that the fire department would have to assume liability. Firefighters attempted to use reservoir water and to preserve water by using foam and smaller hoses, but the buildings were nonetheless destroyed.

**{7}** Sunnyland sued CNMEC in contract and tort, among other causes of action, for damages resulting from the fire, alleging that if CNMEC had taken adequate care prior to disconnecting Sunnyland's electrical service, firefighters and Sunnyland employees would have had access to water and the fire could have been contained. The trial court found CNMEC liable both in contract and in tort. It calculated total consequential damages of over $21 million, of which $13.7 million was the net value of lost crops that the facility would have been able to grow in the absence of the fire. The trial court reduced the damages in tort by 80% to account for Sunnyland's comparative fault; however, in contract, the trial court awarded the entire almost $21.4 million. The trial court allowed plaintiffs to elect a remedy in contract or tort after the resolution of their appeals.

**{8}** The trial court also awarded $100,000 in punitive damages based on CNMEC's failure to restore energy when requested to do so by firefighters. The trial court granted CNMEC an offset of approximately $3.2 million for subrogation rights that it had obtained in a settlement with Sunnyland's insurer. Finally, the trial court awarded post-judgment interest on the contract damages at a rate of 8.75%, awarded post-judgment interest on damages awarded under tort at 15%, and declined to award any prejudgment interest.

**{9}** CNMEC and Sunnyland cross-appealed to the Court of Appeals, which affirmed on all issues raised by Sunnyland and reversed on several issues raised by CNMEC. *See Sunnyland Farms*, 2011-NMCA-049, ¶ 119. The Court of Appeals held that in New Mexico, awards of consequential damages in contract are governed by a "tacit agreement" test, which the trial court had failed to apply. *Id.* ¶¶ 28, 54-55, 60, 66. It therefore reversed the award of damages in contract. *Id.* ¶ 66. It vacated the trial court's calculation of future lost profits, finding that the trial court's calculations of crop yields lacked sufficient evidence and did not rise to the level of "reasonable certainty," *id.* ¶ 99, and then substituted a calculation that it found more reasonable. *Id.* ¶ 100. The Court of Appeals vacated the award of punitive

3

damages due to the trial court's failure to find the facts necessary to establish corporate liability. *Id.* ¶ 84. Finally, it affirmed the trial court's rulings on pre- and post-judgment interest and on CNMEC's offset of the damages. *Id.* ¶¶ 107, 110, 118.

**{10}** Sunnyland appealed all of the Court of Appeals' holdings to this Court. We address each issue in turn.

**DISCUSSION**

**A.     CONTRACT DAMAGES**

**1.     *Hadley v. Baxendale* and Restatement (Second) of Contracts state the proper test for consequential damages in New Mexico**

**{11}** This Court has previously stated that in an action for breach of contract, the breaching party "is justly responsible for all damages flowing naturally from the breach." *Camino Real Mobile Home Park P'ship v. Wolfe*, 119 N.M. 436, 443, 891 P.2d 1190, 1197 (1995). Damages "that arise naturally and necessarily as the result of the breach" are "general damages," which give the plaintiff whatever value he or she would have obtained from the breached contract. *Id.* In some circumstances, the plaintiff can also recover for "consequential damages" or "special damages," which "are not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence." *Id.* (quoting 3 Dan B. Dobbs, *Dobbs Law of Remedies* § 12.2(3), at 41 (2d ed. 1993)) (internal quotation marks omitted).

**{12}** The classic test for whether a plaintiff may recover consequential damages comes from *Hadley v. Baxendale*, 156 Eng. Rep. 145, 9 Ex. 341 (1854). In that case, a mill was temporarily shut down due to a broken crankshaft. *Id.* at 147, 9 Ex. at 344. The defendants were common carriers who were supposed to ship the broken crankshaft to an engineering company to have a new one built, but the defendants "wholly neglected and refused so to do for the space of seven days," and the mill was shut down for five days longer than should have been necessary. *Id.* at 146, 9 Ex. at 342-43. The jury awarded the mill damages for the profits it lost due to the delay. *Id.* at 147, 9 Ex. at 344-45. The appellate court reversed, holding that in an action for breach of contract, recovery was permitted for consequential damages only "such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it." *Id.* at 151, 9 Ex. at 354.

**{13}** The *Hadley* standard has been interpreted as an objective foreseeability test: A defendant is liable for losses that were foreseeable at the time of contracting, regardless of whether the defendant actually contemplated or foresaw the loss. Restatement (Second) of Contracts § 351 cmt. a (1981); *see also id.* Illustr. 1 (illustrating that the Restatement standard comes from *Hadley*). This foreseeability standard is more stringent than "proximate cause" in tort law; the loss must have been foreseeable as the *probable* result of

4

breach, not merely as a possibility. *Hadley*, 156 Eng. Rep. at 151, 9 Ex. at 354; Restatement (Second) of Contracts § 351(1), § 351 cmt. a. The Restatement asks whether there were "special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Id.* § 351(2)(b); *see also* U.C.C. § 2-715(2)(a) (2010) (allowing buyers consequential damages for "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise"). In the absence of such circumstances, the breaching party is liable only for general damages. Restatement (Second) of Contracts § 351 cmt. b ("If loss results other than in the ordinary course of events, there can be no recovery for it unless it was foreseeable by the party in breach because of special circumstances that he had reason to know when he made the contract.").

**{14}** This Court has cited the *Hadley* standard approvingly and described it as the appropriate rule of analysis in New Mexico cases dealing with consequential damages. *See Camino Real*, 119 N.M. at 446, 891 P.2d at 1200 (describing consequential damages standard as "essentially the rule expressed in the seminal case of *Hadley v. Baxendale*"). However, we have also stated that "the foreseeability . . . rule anticipates an explicit or tacit agreement by the defendant" that he or she will assume particular damages if he or she breaches. *Camino Real*, 119 N.M. at 446, 891 P.2d at 1200; *see also Wall v. Pate*, 104 N.M. 1, 2, 715 P.2d 449, 450 (1986) (suggesting that the conditions required for an award of special damages must include a "tacit agreement" (citing *Globe Ref. Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543-44 (1903))).

**{15}** Engaging in an exhaustive analysis of *Camino Real*, *Wall*, and other cases in his well-written opinion, Judge Sutin synthesized a "New Mexico rule" of consequential damages. *Sunnyland Farms*, 2011-NMCA-049, ¶ 33. This rule is similar to the test in Restatement (Second) of Contracts, but it incorporates the requirement that "the non-performing party must explicitly or tacitly agree to respond in damages for the particular damages understood to be likely in the event of a breach." *Sunnyland Farms*, 2011-NMCA-049, ¶ 33. This makes the "New Mexico rule . . . more limited and restrictive than the notion of foreseeability in . . . the Restatement or the UCC." *Id.* ¶ 34; *see also* 11 Joseph M. Perillo, *Corbin on Contracts* § 56.3, at 90 (rev. ed. 2005) (describing tacit agreement test as "a stricter rule than that announced in *Hadley*" (emphasis added)).

**{16}** We now abandon the "tacit agreement" test. While we suspect that there may not, in fact, be much space between a "tacit agreement" and the special circumstances required to render a defendant liable for consequential damages, our previous emphasis on the tacit agreement test from *Globe Refining* is confusing and antiquated. We hold that the proper test for consequential damages in New Mexico is the *Hadley* standard as interpreted in Restatement (Second) of Contracts Section 351. In a contract action, a defendant is liable only for those consequential damages that were objectively foreseeable as a probable result of his or her breach when the contract was made. To the extent our earlier cases suggest a different standard, they are overruled.

5

## 2. There were no special circumstances in this case warranting consequential damages

**{17}**    We review the trial court's application of the law to the facts de novo. *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000-NMSC-033, ¶ 7, 129 N.M. 698, 12 P.3d 960. The trial court in this case issued very limited conclusions of law regarding the issue of foreseeability and consequential damages.  The trial court made one finding of fact stating that "the damages suffered by Plaintiff were foreseeable and a proximate cause [sic—should probably be "result"] of Defendant's Breach of Contract, negligence and negligence per se." However, in its findings, the trial court did not distinguish between the proximate cause required for tort liability and the more stringent foreseeability required for consequential damages in contract. *See* Restatement (Second) of Contracts § 351 cmt. a ("[F]oreseeability is a more severe limitation of liability than is the requirement of substantial or 'proximate' cause in . . . tort."); 11 Perillo § 56.3 at 91 ("Courts have been willing to include in tort actions more remote and less easily foreseeable elements of injury than is the case in contract actions."). The trial transcript reveals that the trial court did consider the *Hadley* standard for special damages in contract:

> [T]he case law generally addresses consequential damages is [sic] that it has to be a contracted damage, generally speaking.  It has to be within the contemplation of the parties, best evidence of that is a contractual agreement. In this case, however, since the contract was with one party being the Co-op and the other party being a general body and being no written—well, written agreement but not being any—not being one-to-one and having a third party PRC, you know, you go back to *Baxter v. Hadendale* [sic], that's a contractual [sic].  And I'm worried about the torts [sic] definition of consequential damages.
>
> I've been toying with this, because, like I said, there is no rule in a New Mexico case that would be on all fours with this.  And it would seem to me that—and I'm going to rule that the Co-op, in providing electricity and being the expert party to the contract should have been aware of the consequential damages of providing electricity and if electricity—failing to provide electricity if there was a breach of contract, that there would be consequential damages.

However, despite this sign that the trial court contemplated the appropriate standard, we cannot say that the trial court actually applied the foreseeability standard correctly.  To support the conclusion that Sunnyland's damages were foreseeable to CNMEC at the time of contracting, we would expect the trial court to find "special circumstances, beyond the ordinary course of events." Restatement (Second) of Contracts § 351(2)(b). Despite the voluminous findings of fact by the trial court, there were no findings that special circumstances of this type existed.

**{18}** Sunnyland suggests that it was sufficient that CNMEC knew that Sunnyland was a for-profit enterprise and it depended on electricity. Both of these factual statements are supported by the trial court's findings of fact and by the evidence presented at trial. The trial court found that "CNMEC [e]mployees . . . testified that it was well known within the community that [the Sunnyland] facility was a hydroponic tomato facility." Furthermore, the trial court found that prior to disconnecting electricity, a CNMEC employee allowed a Sunnyland employee to open the windows in the greenhouse to allow venting, which suggests that CNMEC might have known that cutting off electricity could harm Sunnyland's tomato crop.

**{19}** Taking these findings of fact to indicate the presence of special circumstances is problematic for three reasons. First, although this Court indulges reasonable inferences in favor of the trial court's judgment, *see Tapia v. Panhandle Steel Erectors Co.*, 78 N.M. 86, 89, 428 P.2d 625, 628 (1967), this is simply too speculative. This Court does not speculate about what the fact-finder might have meant to say but did not. *See Econ. Gas Co. v. Bradley*, 472 S.W.2d 878, 880 (Mo. Ct. App. 1971) ("[C]onsider[ing] the evidence in the light most favorable to [the prevailing party] . . . does not require or authorize the court to supply missing evidence, or to give him [or her] the benefit of forced, speculative or unreasonable inferences.").

**{20}** Second, Sunnyland's injury was not directly caused by the lack of electricity. The actual harm was more attenuated: the lack of electricity interrupted Sunnyland's water supply, which, in conjunction with Sunnyland's lack of backup firefighting options, made it difficult for Sunnyland to respond to the fire its employees negligently started. There were no findings that CNMEC should have known that Sunnyland was likely to start fires or was depending on electricity in order to fight any fires that occurred. Even if some damage to the tomato crop was foreseeable from the disconnection of electricity, the particular damage that occurred was not, and consequential damages are only permissible if the particular damage that actually occurred was foreseeable. "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351 cmt. (a).

**{21}** Third, even if CNMEC had reason to know that Sunnyland depended on its electricity to power water in the event of a fire, CNMEC would still not be liable without the presence of additional special circumstances. *Hadley* provides a good example of what does and does not qualify as "special circumstances." 156 Eng. Rep. at 151, 9 Ex. at 355. In *Hadley*, the defendant knew that the crankshaft it was carrying was a broken part of a for-profit mill. *Id.* However, the plaintiff never told the defendant exactly what was at stake, i.e., that there was no backup shaft or other alternative plan to keep the mill running.[1] *Id.* at

---

[1]There is some tension between the opinion of the court and the reporter's description of the facts. The *Hadley* court found that "the only circumstances here communicated by

7

151, 9 Ex. at 355-56. Similarly, in this case, CNMEC would have needed to know not only that Sunnyland depended on its electricity for access to water, but that there was no backup power source, or that there was a particularized need for uninterrupted water or power. There is no evidence that CNMEC had reason to know any of this. In particular, CNMEC could not have been expected to know that Sunnyland did not have a separate power source, independent of the power for the main building, for the well that was to be used in the event of a fire. A firefighter's trial testimony agreed that "if it's going to be an approved firefighting source of water, it has to have two separate sources of electricity . . . [a]nd one of them cannot come through the building that's being . . . protected by the pump," and the trial court found that "Sunnyland Farms was negligent in having only one source of power which ran through the support building to energize the exterior well pump." CNMEC cannot have been expected to anticipate Sunnyland's negligence in this regard.

**{22}** *Langley v. Pacific Gas & Electric Co.*, 262 P.2d 846 (Cal. 1953) (in bank), provides an instructive example of what a utility company would need to know to render it liable for consequential damages in the event of a power shutoff. The plaintiff ran a trout hatchery that required electricity to oxygenate the water and keep the trout alive. *Id.* at 847. If power was shut off, the fish could survive for only three and a half hours. *Id.* at 847-48. The plaintiff purchased electricity from the utility and explained his situation to its employees, asking whether the utility had 24-hour monitoring and would always be able to tell him before power was shut off. *Id.* at 848. The plaintiff told the utility that if it was not able to make this guarantee, he would put in a backup pump. *Id.* The utility's employees assured the plaintiff that he would be notified any time the power was shut off. *Id.* Several years later, power to the fish hatchery was shut off for several hours, and the utility failed to warn or inform the plaintiff. *Id.* Nearly all of the plaintiff's fish died. *Id.* at 849. The plaintiff sued the utility for breach of contract, *id.* at 847, 849, and the California Supreme Court upheld a jury verdict in his favor, apparently including full consequential damages. *Id.* at 847; *see id.* at 850 (stating that the measure of the damages was identical under tort and breach of contract theories). The court found that the utility "knew that a continuous supply of electric current to plaintiff was imperative," and the utility had an obligation either to provide it or to give the plaintiff notice so that he could make alternative arrangements. *Id.* at 850.

---

the plaintiffs to the defendants at the time the contract was made, were, that the article to be carried was the broken shaft of a mill, and that the plaintiffs were the millers of that mill." 156 Eng. Rep. at 151, 9 Ex. at 355. The court went on to observe that the defendants could not have been expected to know that a shipping delay would shut down the mill. *Id.* at 151, 9 Ex. at 355-56. The reporter's statement of the facts in the same decision says that "[t]he plaintiffs' servant told the clerk that the mill was stopped, and that the shaft must be sent immediately." *Id.* at 147, 9 Ex. at 344. We treat the opinion of the court, rather than the reporter's summary, as the authoritative statement of the *Hadley* case. *Corbin on Contracts* observes that "if the reporter's headnote were correct, the decision would have gone the other way." 11 Perillo § 56.2 at 84 n.4.

**{23}** The facts in *Langley* are starkly different from the facts in the present case. In *Langley*, the plaintiff had an unusual and pressing need for uninterrupted service, and he took steps to notify the utility of that need. *Id.* at 848. He also relied on the utility's assurances by choosing not to install backup power, and the utility knew of that fact as well. *Id.* Unlike in *Hadley* and the present case, the utility in *Langley* understood the particular consequences that would result from a breach, and it accepted the contract anyway.

**{24}** There were no findings in this case that CNMEC should have known of a particular vulnerability to fire on Sunnyland's part, or that Sunnyland had no backup source of power or water. With neither findings nor evidence of special circumstances, we cannot uphold a judgment for consequential damages. Accordingly, we affirm the Court of Appeals' reversal of the trial court's award of contract damages to Sunnyland.

## B. THE TRIAL COURT'S DETERMINATION OF LOST PROFITS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

**{25}** Sunnyland also appeals the Court of Appeals' reversal of the trial court's calculation of damages. Although contract damages are no longer at issue, the calculations are still relevant to the tort judgment in favor of Sunnyland. The trial court awarded damages to compensate Sunnyland for profits that were lost due to the fire. The Court of Appeals held that lost profits must be proved with "reasonable certainty." *Sunnyland Farms*, 2011-NMCA-049, ¶ 96. The Court concluded that Sunnyland had not met this burden, and as a result there was insufficient evidence to support the award of lost profits. *Id.* ¶ 99. The Court also suggested a crop yield level that it felt had been established with reasonable certainty. *Id.* ¶ 100.

**{26}** The Court of Appeals noted the difficulty involved in proving future lost profits of a new or unestablished business. *Sunnyland Farms*, 2011-NMCA-049, ¶ 97. In particular, it cited an opinion of this Court, *C. W. Kettering Mercantile Co. v. Sheppard*, 19 N.M. 330, 334, 142 P. 1128, 1129 (1914), which held that "anticipated or expected profits from a business prior to its establishment is an improper element in the measure of damages, because it cannot be proved that they would have been realized." However, this Court seemingly retired the *Kettering* per se rule in *Deaton, Inc. v. Aeroglide Corp.*, 99 N.M. 253, 258, 657 P.2d 109, 114 (1982), in which we stated that "[t]here is no established rule in New Mexico as to whether lost profits [of a new business] may be recovered . . . . The trend elsewhere is to allow lost profits even when the business is new if the loss can be proved with reasonable certainty."

**{27}** *Kettering* reflects the traditional "new business rule," which is a minority approach. *Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1339-40 (S.D. Fla. 2006). As economic forecasting models have become more sophisticated, courts have become more willing to accept predictions that a plaintiff's new business would have been successful. 1 Robert L. Dunn, *Recovery of Damages for Lost Profits* § 4.3, at 391 (6th ed. 2005). The majority of jurisdictions allow unestablished business plaintiffs to collect lost

9

profit damages if they can prove with reasonable certainty the fact of lost profits. *Id.* at 378. The dollar amount of lost profit damages, however, does not require the same level of proof. *Id.* § 1.8 at 25 ("[T]he [reasonable certainty] rule applies only to the *fact* of damages, not to the *amount* of damages."); *id.* § 5.1 at 414 ("[L]ess certainty (or none at all) is required to prove the amount of damages."); *see also Deaton*, 99 N.M. at 258, 657 P.2d at 114 ("Lost profits need not be proved with mathematical certainty."). To remove any doubt as to whether the century-old *Kettering* rule is still good law, we expressly overrule our opinion in *Kettering*.

**{28}** However, the issue in this case is not whether Sunnyland proved with reasonable certainty the fact that it lost profits. Instead, the issue raised by CNMEC is whether the lost profits are supported by substantial evidence. Therefore, we address only the matter of whether there was sufficient evidence to support the calculation of lost profit damages.

**{29}** New Mexico courts will not "set aside [an award of damages] as excessive unless the award is not supported by substantial evidence . . . or [the fact-finder] employed an incorrect measure of damages. . . . A damage award which is reasonably certain, supported by substantial evidence, and not based on speculation, will be upheld on appeal." *Ranchers Exploration & Dev. Corp. v. Miles*, 102 N.M. 387, 390, 696 P.2d 475, 478 (1985). In this case, the trial court appears to have based its calculation of lost profits due to crop loss directly on the testimony of Sunnyland's expert witness. The Court of Appeals has refused to find a damage award excessive when the award precisely matched the estimate given by a testifying expert. *Diversey Corp. v. Chem-Source Corp.*, 1998-NMCA-112, ¶ 35, 125 N.M. 748, 965 P.2d 332. The Court noted that " '[a]n expert's opinion is not impermissibly speculative or lacking as to a factual basis where the expert gives a satisfactory explanation as to how he arrived at his opinion.' " *Id.* ¶ 32 (quoting *Sanchez v. Molycorp, Inc.*, 103 N.M. 148, 152, 703 P.2d 925, 929 (Ct. App. 1985) (alteration in original)). Therefore, we examine the record to determine whether the expert testimony was impermissibly lacking as to factual basis.

**{30}** The crop loss estimate was based on the testimony of Sunnyland's expert witness, Dr. William Bauerle. Bauerle testified that he had a doctorate in "vegetable crop physiology, nutrition, and pathology" from Cornell University and he had previously worked as a researcher for Ohio State University, although he was retired at the time of his testimony. He testified that he mostly did work for insurance companies, but he also consulted for one hydroponic tomato operation in Ontario. He also testified that he had done over one hundred crop loss estimates.

**{31}** Prior to testifying, Bauerle had visited the site of Sunnyland's Estancia facility, and he estimated Sunnyland's probable output based on "the characteristics of the greenhouse, the characteristics of the climate, the archived data[,] . . . what the potential is for the crop, and what the varieties of . . . the crop are for [the] period." He testified that the Sunnyland greenhouse was "state of the art," with such positive features as (1) "excellent" water quality, as indicated by good condition of the bedding plants being currently grown, as well

10

as the lack of sediment and sodium chloride; (2) water in sufficient volume to support hydroponics; (3) a computer-controlled environment; (4) supplemental carbon dioxide; (5) "excellent light intensit[y]"; and (6) sufficient height to allow for plant growth. Bauerle also noted that Sunnyland had grafted plants onto improved rootstock to improve their water intake, and Sunnyland planned to intercrop, which would allow the facility to produce plants 365 days per year.

**{32}** Bauerle said that Sunnyland planned to grow Dundee and Geronimo beefsteak tomatoes. According to the company that sold the tomato seeds, both tomatoes have an average size of over eight ounces. Bauerle said that each cluster of tomatoes would consist of roughly four tomatoes and have a total weight of about thirty-two ounces or two pounds, although he said that clusters could range in weight from two to three-and-a-half pounds. Bauerle estimated that a cluster would grow to maturity in nine days (he stated that this estimate was on the high end of the possible range, due to the good light intensity in the area), and he divided 365 days by 9 to get 40 clusters per plant per year. If each cluster weighed approximately two pounds, that would be 80 pounds per plant per year. Bauerle testified that he reduced his estimate to 75 pounds per plant per year to give "a conservative estimate."

**{33}** Bauerle testified that the facility was a 20-acre site with 220,000 plants in it. He also consulted USDA pricing for tomatoes. Based on Bauerle's testimony and the testimony of a forensic accountant, the trial court found a net crop loss value of $13,704,828. The only dispute seems to be over Bauerle's estimate of the tomato crop yield that the Sunnyland facility would have produced. *See Sunnyland Farms*, 2011-NMCA-049, ¶¶ 85-86, 99 (discussing CNMEC's claim that Bauerle's estimates were speculative, and therefore that the lost profits award was supported by insufficient evidence).

**{34}** On cross-examination, CNMEC challenged Bauerle's projections as overly optimistic. CNMEC's attorney read Bauerle a quotation from a scientist who stated that producing the volume of tomatoes in Bauerle's estimate was "biologically and technologically impossible," but this expert did not testify at trial, and the statement did not qualify as evidence. It is uncontested that Bauerle's estimates were not based on any actual history of production in the facility, which Bauerle said could be skewed by a catastrophic event in any given year. Bauerle admitted that he had never previously testified in the United States, although apparently he had done so in Canada, and that his work in the Southwest United States had been very limited.

**{35}** CNMEC called its own expert witness, Kenneth Gerhart, a tomato grower and consultant. Much of Gerhart's testimony was devoted to rebutting Bauerle's earlier testimony. He testified that Bauerle had failed to take into account factors such as "[d]isease, virus, insects, the grower . . . , [problems with] interplanting, [and] equipment failure." He testified that there was a learning curve for tomato growers, who rarely achieved the highest possible yields in their first year of production. Gerhart thought that light was more of a problem than Bauerle had realized. Gerhart also testified that

11

intercropping was not feasible year-round because of the possibility of disease, and he testified that the average fruit size published by seed companies is not accurate over the life of a crop.

{36}     Gerhart characterized Bauerle's estimates as unrealistic.  Bauerle's estimate was equivalent to 95 kilograms of tomatoes per square meter per year; Gerhart said that the highest yield he had ever heard of for beefsteak tomatoes was 70 kilograms per square meter per year.  He testified that his "reasonable production projection" for the destroyed facility was 58 kilograms per square meter per year.  Gerhart based this opinion on his own average yield over eight years in a facility in Las Vegas, Nevada, where his average was 58.5 kilograms per square meter per year.  In essence, Gerhart testified that there was no way to run a profitable greenhouse on the Sunnyland site.

{37}     On this record, we cannot say that the damage award was overly speculative or unsupported by substantial evidence.  Bauerle explained his reasoning and calculations, giving "a satisfactory explanation as to how he arrived at his opinion."  *Diversey Corp.*, 1998-NMCA-112, ¶ 32 (internal quotation marks and citation omitted).  The trial court evidently credited Bauerle's estimates over Gerhart's.  "[W]hen there is a conflict in the testimony, we defer to the trier of fact."  *Buckingham v. Ryan*, 1998-NMCA-012, ¶ 10, 124 N.M. 498, 953 P.2d 33.

{38}     Moreover, it was not wholly irrational for the trial court to credit Bauerle's testimony.  Bauerle was an academic with a doctoral degree who had previously done more than one hundred crop loss estimates.  Gerhart was an experienced tomato farmer, but he was not an academic; he testified that he did not have a college degree, and in his testimony he did not specifically take issue with Bauerle's model or calculations, instead choosing to explain the factors that he thought Bauerle had improperly omitted.  Gerhart testified that he had never previously done a crop loss assessment, and his estimate was based solely on the average yields achieved by his own greenhouse.

{39}     It is not error for a trial court to credit one expert's testimony over another's.  *See In re Yalkut*, 2008-NMSC-009, ¶ 18, 143 N.M. 387, 176 P.3d 1119 ("[When the trial court's] 'findings of fact are supported by substantial evidence . . . refusal to make contrary findings is not error.'" (quoting *Griffin v. Guadalupe Med. Ctr., Inc.*, 1997-NMCA-012, ¶ 22, 123 N.M. 60, 933 P.2d 859)).  Therefore, we reverse the Court of Appeals on this issue and reinstate the trial court's calculation of the negligence damages.

## C.     THE TRIAL COURT'S AWARD OF PUNITIVE DAMAGES WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

{40}     The trial court awarded Sunnyland $100,000 in punitive damages because CNMEC "imped[ed] the firefighters with the threat of liability if the electricity was energized."  The trial court found that

the conduct of [CNMEC] was wilful, reckless, wanton and in bad faith . . . when it threatened [firefighter] Wayne Granger with 'liability' twice before turning on the power to the facility after Wayne Granger requested the assistance of [CNMEC] to reenergize the facility to allow the firefighters access to more water to fight the fire.

The Court of Appeals reversed the award of punitive damages, holding, inter alia, that the trial court had not found any of the factors required to subject a corporation to punitive damages. *Sunnyland Farms*, 2011-NMCA-049, ¶¶ 83-84. To find a corporation in New Mexico liable for punitive damages based on the misconduct of its employees, at least one of three factors must be present: "(1) corporate employees possessing managerial capacity engage in conduct warranting punitive damages; (2) the corporation authorizes, ratifies, or participates in conduct that warrants punitive damages; or (3) under certain circumstances, the cumulative effects of the conduct of corporate employees demonstrate a culpable mental state warranting punitive damages." *Chavarria v. Fleetwood Retail Corp.*, 2006-NMSC-046, ¶ 21, 140 N.M. 478, 143 P.3d 717. The trial court did not explicitly find any of the three factors; Sunnyland argues that the trial court was not required to do so and that the third factor applies.

**{41}** We review the factual findings underpinning an award of punitive damages for substantial evidence. *Helena Chem. Co. v. Uribe*, 2013-NMCA-017, ¶ 35, 293 P.3d 888. Interpreting the trial court's findings generously, we will assume that the court implicitly found the presence of the third *Chavarria* factor when it found that CNMEC's conduct was "wilful, reckless, wanton and in bad faith." The trial court evidently based its finding that CNMEC employees "threatened [firefighters] with 'liability' twice," on the testimony of Wayne Granger, the firefighter in charge at the scene. Granger testified that he called the dispatcher to see if CNMEC would re-connect power so that the firefighters could use the well:

> I asked [the dispatcher] if we could have the Co-op turn on the power to the well. . . . They called me back and said the Co-op cannot turn the power on unless you assume the liability. And I asked the dispatcher . . . what is the liability that I would accept or take responsibility of? She said, I don't know. I said, well, find out. What are they telling me that I would assume liability? So she called me back and she said, they won't turn it on, but you'd have to assume the liability. And I said, well, I don't know what the hell they're talking about, so I'm going to go on with my other Plan B, if they can't turn on the power and give me water.

Granger's testimony, taken alone, would tend to support the finding of fact that forms the basis of the punitive damages award. However, the trial court also heard both the testimony of CNMEC employees and the tape of CNMEC employees talking to dispatch, and neither of those sources mentions liability. Paul Chavez, a CNMEC employee, actually said to dispatch, "[T]here is a heck of a fire and I don't know what it is going to do when I send

13

these jacks in but I will not be held responsible. . . . I just don't want to be responsible if something happens." Chavez clarified in his testimony that he was concerned that a firefighter would be hurt or killed if he re-energized the facility.

**{42}** The evidence presented at trial supports Chavez's concern. Witnesses were split about how much danger electricity would have posed to the firefighters. Two firefighters testified that they could safely fight fires in the presence of electricity, supporting the trial court's analysis. However, two other witnesses testified that they were concerned about the safety ramifications of introducing electricity or they would not have turned the power on if asked.

**{43}** Additionally, Wayne Granger seriously qualified his statements during his trial testimony. During his testimony, Granger stated that he would have wanted to speak with CNMEC employees and did not want them to re-energize the site without talking to him first. Granger also testified that he assumed that there was a power source to the well that could be turned on without energizing the burning building, thereby reducing the risks to the firefighters on the scene. This was incorrect; Sunnyland had only one power source at the site, and turning it on would have energized the burning support building as well as the well pump.

**{44}** "Substantial evidence is that which a reasonable mind accepts as adequate to support a conclusion." *Chavarria*, 2006-NMSC-046, ¶ 12 (internal quotation marks and citation omitted). Granger's testimony was the only evidence presented at trial to support the finding that CNMEC "threatened [him] with liability," and the conclusion that there were threats is directly contradicted by the recording of CNMEC employees' conversation with dispatch. Furthermore, the evidence indicates that there was real danger in energizing the scene—perhaps more than Granger realized at the time, given Sunnyland's electrical setup—and CNMEC employees' caution about re-energizing the scene was warranted. Given the overwhelming weight of evidence suggesting that CNMEC employees did not, in fact, threaten firefighters with liability, combined with the evidence strongly suggesting that CNMEC employees were acting in the interest of the firefighters' safety, we cannot find that there was substantial evidence supporting the third *Chavarria* factor. *See Fraser v. State Sav. Bank*, 18 N.M. 340, 352, 137 P. 592, 594 (1913) ("[T]his Court will not review the evidence further than to determine whether or not the findings are supported by substantial evidence, *in the absence of such an overwhelming weight of evidence against such findings as would clearly show that the trial Court erred in its conclusions drawn therefrom.*" (emphasis added)). We affirm the Court of Appeals and vacate the award of punitive damages.

**D.      THE TRIAL COURT'S OFFSET OF DAMAGES WAS CONTRARY TO NEW MEXICO'S PUBLIC POLICY**

**{45}** Sunnyland Farms was insured by West American Insurance Co., which paid it approximately $3.2 million. West American and its parent company, Ohio Casualty

14

Insurance Co., were plaintiffs in this action against CNMEC. However, CNMEC settled with them prior to the start of trial. Under the terms of the settlement, CNMEC paid West American $1.3 million and acquired its subrogation lien against Sunnyland. After CNMEC was found liable, it moved to offset the damages against it based on its purchase of West American's subrogation interest. The trial court granted the motion and offset CNMEC's liability by the full subrogation lien of just over $3.2 million. The Court of Appeals upheld this setoff. *Sunnyland Farms*, 2011-NMCA-049, ¶ 118. Sunnyland appeals the setoff, arguing that it violates the collateral source rule and the public policy of the State of New Mexico. We agree with Sunnyland, and we reverse.

**{46}** "[S]ubrogation is an equitable remedy." *State Farm Mut. Auto. Ins. Co. v. Found. Reserve Ins. Co.*, 78 N.M. 359, 363, 431 P.2d 737, 741 (1967). Ordinarily, we review a trial court's exercise of its equitable powers for abuse of discretion. *United Props. Ltd. Co. v. Walgreen Props., Inc.*, 2003-NMCA-140, ¶ 6, 134 N.M. 725, 82 P.3d 535. However, "[t]he question of whether . . . the district court is *permitted* to exercise its equitable powers is a question of law," *id.* ¶ 7 (emphasis added), which is reviewed de novo. *Id.* ¶ 6. In this case, the question is whether the law permitted the trial court to award an offset to the defendant, CNMEC. Sunnyland has not argued that if the offset was actually within the trial court's discretion, it constituted an abuse of that discretion. Therefore, since the question presented concerns the bounds of the trial court's equitable powers rather than their use, we review de novo whether the trial court was able to grant the offset. *Id.* ¶¶ 6-7.

**{47}** This question implicates a number of policy considerations, including New Mexico's policy against allowing "double recovery" for plaintiffs. In general, plaintiffs may not collect more than the damages awarded to them, or, put another way, they may not receive compensation twice for the same injury. *Hale v. Basin Motor Co.*, 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) ("New Mexico does not allow duplication of damages or double recovery for injuries received."); *see also* NMSA 1978, § 41-3-4 (1947) (specifying that if a plaintiff settles with a tortfeasor, the plaintiff's claim against any remaining joint tortfeasors is reduced by the amount of the settlement).

**{48}** However, the collateral source rule is an exception to the rule against double recovery. *McConal Aviation, Inc. v. Commercial Aviation Ins. Co.*, 110 N.M. 697, 700, 799 P.2d 133, 136 (1990), *limitation of holding on other grounds recognized by Summit Props., Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-010, ¶ 45, 138 N.M. 208, 118 P.3d 716. The classic statement of the collateral source rule is that "[c]ompensation received from a collateral source does not operate to reduce damages recoverable from a wrongdoer." *Trujillo v. Chavez*, 76 N.M. 703, 708, 417 P.2d 893, 897 (1966). In other words, if a plaintiff is compensated for his or her injuries by any source unaffiliated with the defendant, the defendant must *still* pay damages, even if this means that the plaintiff recovers twice.

**{49}** There are several justifications for the collateral source rule. If the plaintiff can recover his or her full damages from the defendant, the plaintiff has the means to reimburse the collateral source. *See Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co.*, 2006-

NMCA-151, ¶ 20, 140 N.M. 720, 148 P.3d 806 (suggesting that the protection of subrogation rights justifies the collateral source rule). This allows the ultimate burden of compensating the plaintiff to fall on the defendant, rather than on blameless but generous parties. "The right of redress for wrong is fundamental. Charity cannot be made a substitute for such right, nor can benevolence be made a set-off against the acts of a tort-feasor." *Mobley v. Garcia*, 54 N.M. 175, 177, 217 P.2d 256, 257 (1950); *see also Martinez v. Knowlton*, 88 N.M. 42, 44, 536 P.2d 1098, 1100 (Ct. App. 1975) ("[A] tort-feasor should not get the benefit of the contract between the [victim and a third party]."). Additionally, knowing that they have some likelihood of being reimbursed may make third parties more likely to help victims during the time before they are able to collect from the defendant.

**{50}** If the third party or collateral source does *not* seek compensation, its contribution could benefit either the defendant, by reducing the damages that the defendant must pay, or the plaintiff, by allowing the plaintiff to recover twice. In New Mexico, the collateral source rule dictates that the contribution of a collateral source must operate to benefit the plaintiff rather than the defendant. " 'Whether [the collateral contribution] is a gift or the product of a contract of employment or of insurance, the purposes of the parties to it are obviously better served and the interests of society are likely to be better served if the injured person is benefitted than if the wrongdoer is benefitted.' " *McConal Aviation*, 110 N.M. at 700, 799 P.2d at 136 (quoting *Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C. Cir. 1954)); *see also McConal Aviation*, 110 N.M. at 703, 799 P.2d at 139 (" 'If there must be a windfall certainly it is more just that the injured person shall profit therefrom, rather than the wrongdoer shall be relieved of his full responsibility for his wrongdoing.' ") (Montgomery, J., specially concurring) (quoting *Grayson v. Williams*, 256 F.2d 61, 65 (10th Cir. 1958)). Lastly, a plaintiff's "double recovery" is likely to be more egregious in theory than in practice; in reality, plaintiffs rarely receive their full damages, since they must pay attorney fees out of their damages. *McConal Aviation*, 110 N.M. at 703, 799 P.2d at 139 (Montgomery, J., specially concurring). Allocating the collateral contribution to their benefit, rather than to the benefit of the defendant, makes it more likely that the plaintiff will be fully compensated. *Id.*

**{51}** In the present case, part of the question is whether a collateral source, i.e. Sunnyland's insurer, remains "collateral" to the defendant after settling with it and transfering its subrogation rights to it. If CNMEC's settlement payment to West American transforms the insurance payments into a non-collateral contribution, then CNMEC can offset the damages it must pay to Sunnyland by the amount of the insurance payments. We note that in general, New Mexico has a policy of encouraging settlements, *id.* at 700, 799 P.2d at 136, which would suggest that we should allow such an offset. CNMEC accurately observes that several other states permit offsets where a defendant has settled with the plaintiff's insurer. *See, e.g.*, *Ferrellgas, Inc. v. Yeiser*, 247 P.3d 1022, 1027 (Colo. 2011) (en banc) (allowing defendant to offset damages by entire amount paid by the insurer to the plaintiff)*; Hayes Sight & Sound, Inc. v. ONEOK, Inc.*, 136 P.3d 428, 442 (Kan. 2006) (allowing setoff but limiting it to amount that the defendant paid to the insurer). Sunnyland counters that allowing this offset would undermine New Mexico's collateral source rule and

16

allow an insurer to subrogate against its own insured, contrary to *State ex rel. Regents of N.M. State Univ. v. Siplast, Inc.*, 117 N.M. 738, 741-42, 877 P.2d 38, 41-42 (1994).

**{52}** We disagree with Sunnyland that allowing the offset would violate the rule stated in *Siplast*. In *Siplast*, we were concerned that allowing an insurer to subrogate against its own insured would increase litigation and create conflicts of interest. *Id.* at 742-43, 877 P.2d at 42-43. Neither of those considerations would be implicated by allowing defendants to step into the shoes of insurers and assume their right of subrogation.

**{53}** However, we have one concern here that was not at issue in *Siplast*: subrogation is not truly a right, but an equitable remedy. "Subrogation, whether created by contract or by operation of law, is an equitable remedy and equitable principles control its application." *Farmers Ins. Grp. of Cos. v. Martinez*, 107 N.M. 82, 83, 752 P.2d 797, 798 (Ct. App. 1988). "The remedy is for the benefit of one secondarily liable who has paid the debt of another and to whom *in equity and good conscience* should be assigned the rights and remedies of the original creditor." *Found. Res.*, 78 N.M. at 363, 431 P.2d at 741 (emphasis added). The question is whether the principles of equity permit a defendant to assert a right of subrogation that it acquires from the plaintiff's insurer.

**{54}** We hold that they do not. We recognize that "[t]he person asserting the right to subrogation must be without fault." *Hocker v. N.H. Ins. Co.*, 922 F.2d 1476, 1486 (10th Cir. 1991). While there was no malice proven on the part of the defendant in this case, CNMEC does not contest the trial court's findings that it was negligent and breached its contract with Sunnyland. We have stated that "the right [of subrogation] flows from principles of justice and equity." *Fid. & Deposit Co. of Md. v. Atherton*, 47 N.M. 443, 449, 144 P.2d 157, 161 (1943). When the party exercising the right is an innocent third party who compensated the plaintiff, justice and equity dictate that the party should have the right to recover from the plaintiff, regardless of whether the compensation originated in generosity or contractual obligation. A defendant is not similarly situated to such a party. A defendant who has been found liable is ordinarily expected to pay the plaintiff's full damages, and requiring him or her to do so does not offend principles of justice or equity. It does not matter that the defendant has attempted to step into the shoes of the collateral source by contract. Equity concerns itself with the substance of a matter, not with its form. *Skaggs Drug Ctr. v. Gen. Elec. Co.*, 63 N.M. 215, 226, 315 P.2d 967, 974 (1957).

**{55}** Our holding does not prevent a defendant from settling with the plaintiff's insurance company, but it does mean that the defendant will not be able to exercise any subrogation lien that it acquires as part of that settlement. The defendant should settle with the plaintiff's insurers with the full knowledge that neither the insurers' previous payments to the plaintiff, nor the defendant's payments to the insurers at the time of settlement, will offset the damages that the defendant must pay to the plaintiff. This holding also does not limit the right of insurers to sell or transfer their subrogation liens, so long as they do not transfer the liens to the defendant.

17

E.    **THE POST-JUDGMENT INTEREST ON THE TORT JUDGMENT WAS CORRECTLY CALCULATED, AND THE INTEREST ON THE CONTRACT JUDGMENT IS NO LONGER AN ISSUE**

**{56}**    Ordinarily, interest on judgments is calculated at 8.75% from the date of entry. NMSA 1978, § 56-8-4(A) (1993). Sunnyland requested post-judgment interest of 15% on its contract claim, arguing that the judgment was based on CNMEC's "tortious conduct, bad faith or intentional or willful acts," which warrants a higher interest rate under Section 56-8-4(A)(2). The trial court denied Sunnyland's motion and awarded interest on the contract damages at the ordinary rate of 8.75%. The Court of Appeals affirmed the trial court. *Sunnyland Farms*, 2011-NMCA-049, ¶ 107.

**{57}**    The litigation regarding post-judgment interest appears to involve only the contract award. Because we have already determined that the contract award was contrary to New Mexico law, there is no reason to delve into the interest rate that would have applied to the now-vacated contract damages.

**{58}**    To avoid confusion, we note briefly that the tort judgment remains intact, and post-judgment interest on it should be calculated at 15%, as originally determined by the trial court. This is the appropriate rate for a "judgment [that] is based on tortious conduct." Section 56-8-4(A)(2); *see also Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 55, 131 N.M. 100, 33 P.3d 651 ("When a judgment is based on tortious conduct, bad faith, or a finding that the defendant acted intentionally or willfully, a court must award interest at the higher rate of 15 percent."). "[T]ortious conduct" includes negligence. *Sandoval v. Baker Hughes Oilfield Operations, Inc.*, 2009-NMCA-095, ¶ 78, 146 N.M. 853, 215 P.3d 791; *Diamond D Constr.*, 2001-NMCA-082, ¶ 58.

F.    **THE TRIAL COURT'S DENIAL OF PREJUDGMENT INTEREST WAS NOT AN ABUSE OF DISCRETION**

**{59}**    Sunnyland also sought prejudgment interest from the trial court under Section 56-8-4(B), which states:

> [T]he court in its discretion may allow interest of up to ten percent from the date the complaint is served upon the defendant after considering, among other things:
>
> (1)    if the plaintiff was the cause of unreasonable delay in the adjudication of the plaintiff's claims; and
>
> (2)    if the defendant had previously made a reasonable and timely offer of settlement to the plaintiff.

The trial court refused to award prejudgment interest. The Court of Appeals affirmed the denial. *Sunnyland Farms*, 2011-NMCA-049, ¶ 110. We also affirm.

**{60}** The decision whether or not to award prejudgment interest is within the discretion of the trial court, and we review only for abuse of that discretion. *See* Section 56-8-4(B); *Martinez v. Pojoaque Gaming, Inc.*, 2011-NMCA-103, ¶ 20, 150 N.M. 629, 264 P.3d 725. Sunnyland argues that the trial court abused its discretion by failing to award interest, given that CNMEC rejected Sunnyland's pre-trial settlement proposals and made a counter-offer that was allegedly so inadequate as to be "not in good faith." CNMEC counters that its settlement offer was reasonable given the difficult legal issues in the case, the high degree of comparative fault, and the disputed damages calculations.

**{61}** The trial court is not required to make specific factual findings when denying prejudgment interest under Section 56-8-4(B). "The court's reasons for denying prejudgment interest need only be ascertainable from the record and not contrary to logic and reason." *Gonzales v. Surgidev Corp.*, 120 N.M. 133, 150, 899 P.2d 576, 593 (1995). The trial court may also consider equitable considerations not stated in Section 56-8-4(B) if they further the statute's goals of "foster[ing] settlement and prevent[ing] delay." *Gonzales*, 120 N.M. at 150, 899 P.2d at 593 (emphasis omitted) (internal quotation marks and citation omitted).

**{62}** In this case, it was not an abuse of discretion for the trial court to deny prejudgment interest. Difficult legal issues can contribute to legitimate delays in settlement, *Bird v. State Farm Mut. Auto. Ins. Co.*, 2007-NMCA-088, ¶ 35, 142 N.M. 346, 165 P.3d 343, and there is no denying the complexity of this case, which raised thorny issues of causation, comparative fault, and estimation of lost profits. In addition, while CNMEC's pre-trial settlement offer of just over half a million dollars was far less than the trial court awarded, the record indicates that Sunnyland's lowest settlement offer was $12 million, which is much more than Sunnyland will receive without the damages from the erroneous contract award. We do not bring up this issue to fault either CNMEC or Sunnyland for their refusal to settle, but simply to indicate that the parties appear to have had genuine differences of opinion on the strength of Sunnyland's case. Such differences in opinion could easily arise from the complexity of the issues in this case. Therefore, it was not an abuse of discretion for the trial court to deny prejudgment interest to Sunnyland.

## CONCLUSION

**{63}** We affirm the Court of Appeals' reversal of the consequential damages in contract and the punitive damages. We reverse the Court of Appeals' reversal of lost profit damages in tort. We also affirm the denial of prejudgment interest. The post-judgment interest is no longer in dispute. We remand for further proceedings consistent with this opinion.

**{64}** **IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Chief Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**BARBARA J. VIGIL, Justice**


_____
**CLAY CAMPBELL, Judge**
**Sitting by designation**

**Topic Index for *Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop., Inc.*, No. 32,968;**

**APPEAL AND ERROR**
Standard of Review
Substantial or Sufficient Evidence

**CONTRACTS**
Breach
Negligent Performance

**EVIDENCE**
Expert Witness

**JUDGMENT**
Post Judgment Relief

**REMEDIES**
Apportionment of Damages
Consequential Damages
Credits and Offsets
Economic Loss
Excessive Damages
Future Damages
Lost Profits
Measure of Damages
Prejudgment Interesat

Proof of Damages
Punitive Damages

**TORTS**
Contribution Among Tortfeasors
Foreseeability
Negligence